Dennis STANGE, Appellant,

v.

STATE of Alaska, Appellee.

No. 2725.

Supreme Court of Alaska.

Feb. 7, 1977.

Mark I. Wood, Rice, Hoppner & Hedland, Fairbanks, for appellant.

Patrick J. Gullufsen, Asst. Dist. Atty., John Hayduke, Legal Intern, and Harry L. Davis, Dist. Atty., Fairbanks, Avrum M. Gross, Atty. Gen., Juneau, for appellee.

## OPINION

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR and BURKE, JJ.

RABINOWITZ, Justice.

Appellant Dennis Stange was indicted for the crime of embezzlement by an employee in violation of AS 11.20.280.[1] Subsequent to the return of the indictment Stange made several pre-trial motions to suppress on the grounds that the evidence in question was obtained by means of illegal searches and seizures. Finding the searches in question reasonable, the superior court denied Stange's suppression motions. Stange then changed his plea to nolo contendere to the embezzlement charge.[2] His plea was conditioned on the understanding that it could be withdrawn if this court reversed the superior court's determination of the search and seizure issues.[3]

We turn first to the particular facts which control our disposition of the appeal. In the latter part of May 1975, a series of air freight shipments from Deadhorse, near Prudhoe Bay, arrived at the Wien Air Alaska freight terminal in Anchorage. The various items were addressed for delivery to "Stan" or "Mr. Stan" from "Stan" or "Mr. Stan."[4] Instructions on the air freight bills or on the cartons themselves stated "Hold for Pickup."[5]

After several of these packages had been at the Wien freight offices for approximately five days, Marion Kane, an Air Freight Agent for Wien in Anchorage, opened one of the cartons in an attempt to ascertain further information regarding the address of the consignee. Under CAB tariff regulations Kane had authority to open the carton for the purpose of identifying the consignee or his address. Although

1. The indictment, in part, reads:

That on or about the 1st and 28th day of May, 1975, at or near Deadhorse . . . Dennis K. Stange being . . . an employee of Dowell Company did . . . unlawfully . . . embezzle or fraudulently convert to his own use various pieces or tools, parts and equipment including one 55 gallon, brown and tan fiberglass drum of an approximate value of $200.00; one grey Denison hydraulic pump, Serial No. 18879, of an approximate value of $500.00; one grey Denison hydraulic motor, Serial No. 25480, of an approximate value of $300.00; eleven Brass colored Corbin padlocks, Serial Number 4F34726, of an approximate total value of $45.00; a series of numbered stamps or stencils in used condition partially covered with orange and black paint of an approximate value of $15.00; two Fafnir bearing assemblies of an approximate total value of $40.00; 2 Detroit Diesel Blowers commonly used on 353 Diesel Engines and of an approximate value in excess of $300.00 each; and miscellaneous tools and parts of an undetermined value, all of which is the property of Dowell Company, said property having come into his possession or under his control by virtue of his employment with Dowell Company.

2. Upon accepting Stange's plea of nolo contendere, the superior court entered an order suspending the imposition of sentence and placing Stange on probation for a period of three years. One of the conditions of probation imposed by the superior court was that Stange pay $1,500 in costs to the clerk of the superior court.

3. The superior court agreed to accepting the plea with the understanding that Stange would be given the opportunity to obtain appellate review of its search and seizure rulings.

4. No further address or any other means of identifying the consignee was on any of the packages.

5. The shipments in question consisted of several crates, three cartons and an empty 55-gallon fiberglass drum.

Kane did not obtain any additional information as to the address or identity of the consignee, he observed new locks, bearings, spark plugs, a portapower jack, and several other little boxes all within the opened carton. Kane then retaped the carton and placed it back in storage. Subsequently, similar shipments from Deadhorse arrived at the Wien freight offices.[6]

According to Kane these shipments were out of the ordinary because it was unusual to receive a consignment with so little information concerning the consignee; that cartons and crates of the sizes which comprised the subject shipments normally were sent from a company or construction outfit;[7] and that new items, such as those he observed after opening the one carton, were normally not shipped by an individual to an individual.

Although the record does not contain any explicit reference to the event, it is a reasonable inference from what followed that Kane discussed these unusual shipments with his supervisors at Wien. For, on May 27, 1975, George Dahl, an Alyeska Pipeline Security employee, went to the Wien freight terminal in Anchorage.[8] There Cleo Johnson, Kane's supervisor, pointed out the cartons and crates and generally related to Dahl where they had been shipped from and who was the named consignee.[9] Dahl then asked Johnson and Kane collectively, "Can you legally open these packages?" and received an affirmative answer. Dahl further testified that Johnson and Kane "basically indicated that FAA gave them the right to open packages to inspect for flammable materials, for materials that might

be dangerous to the cargo, the aircraft, for information . . . that might be contained therein—to assist in identifying the owner . . . ." According to Dahl, his response was, "Well, if you can legally do this, let's look." Neither Johnson nor Kane informed Dahl that any of the cartons or crates in question had previously been opened by Kane.

In an affidavit which was executed prior to his testimony at the suppression hearing, Kane averred that on the second occasion that he opened the carton in question he did so in response to Dahl's request. However, at the suppression hearing, Kane testified that he opened the carton the second time at the direction of Johnson, his supervisor, and that he probably would not have opened the carton at the request of Dahl without a warrant or court order.[10]

On this second occasion Kane reopened the same carton he had previously opened and resealed. The contents of the carton were then shown to Dahl. Dahl stated that the carton was not resealed, but was then placed in a locker in an open condition.[11] Subsequent to his viewing the contents of the carton, Dahl informed the Alaska State Troopers of the subject shipments, as well as of the contents of the carton which had been opened in his presence. Glenn Flothe, an investigator for the State Troopers, then went to the Wien cargo terminal for the purpose of interviewing Kane regarding the suspect shipments. Flothe interviewed Kane and also observed the contents of the carton which had been opened twice previously. At this time, Flothe observed similarly marked cartons and crates, all of

---

**6.** After the arrival of these subsequent shipments, Wien sent teletypes to Deadhorse attempting to identify the consignee.

**7.** The lightest of the crates and cartons shipped by Mr. Stan weighed 117 pounds.

**8.** Dahl was sent to the cargo terminal on instructions from his supervisor who had in turn received a call from Mr. Huff of Wien concerning some "suspicious" shipments.

**9.** Dahl saw for himself that the shipments were marked generally to "Stan" from "Stan"—"Hold for Pickup."

**10.** More particularly, Kane testified that Johnson introduced Dahl and then said, " 'Would you please open the package in the presence of Mr. Dahl?' of which I was doing under my supervisor's direction."

**11.** In an affidavit which was obtained from Kane before the suppression hearing was held, Kane stated that he resealed the carton before placing it in the locker.

which had been shipped from Deadhorse to Anchorage via Wien and marked "Stan" or "Mr. Stan" to "Stan" or "Mr. Stan," "Hold for Pickup." In all, Flothe noted three large wooden crates, one small wooden crate, three cardboard cartons, and "one open-topped fiberglass drum, size approximately 55 gallons, wrapped on the outside in paper and plastic, which is of an unusual type." After further investigation and interviews, Trooper Flothe prepared a detailed and lengthy affidavit in support of a search warrant. The district court then issued a search warrant which authorized search of the crates and cartons in question for stolen property. The cartons and crates were subsequently searched under the authority of the warrant and appellant Stange thereafter arrested for the crime of embezzlement by an employee. As we mentioned previously, the case is now before us upon Stange's appeal from the superior court's refusal to grant his motions to suppress all evidence which was obtained as a result of the Dahl search as well as the search made pursuant to the warrant.

In this appeal Stange concedes the appropriateness of the initial opening of the carton which was made by Kane for the purpose of attempting to further identify the consignee "Mr. Stan." *See Bell v. State*, 519 P.2d 804 (Alaska 1974). Stange also concedes that if the search warrant obtained by Trooper Flothe is valid, then the search made by the troopers of the crates and cartons is immune from constitutional attack. Stange's principal thesis, however, is that the warrant was "hopelessly tainted" since it was based on the constitutionally impermissible search made by Dahl.[12]

In support of his contention that the Dahl search ran afoul of the constitutional prohibition against unreasonable searches and seizures, Stange has advanced two primary arguments. First, Stange contends that the Dahl search was constitutionally infirm because ". . . it was made without a search warrant solely to further a criminal investigation and not for an independent airline purpose." Secondly, Stange argues that the Alaska and federal guarantees against unreasonable searches and seizures are applicable "because quasi-governmental or private institutional investigative officers should be held to the same Fourth Amendment standard as governmental investigative officers regarding searches and seizures."

Stange commences his first argument by stating that the law is well established in the circumstances where the government "instigates or encourages or participates" in a private search, or where "the only purpose of the private search is to further governmental investigations, the requirements of the Fourth Amendment must be met."[13] Stange then characterizes the "precise issue" as whether the search made of the carton "by a private airline agent without a warrant under the authority of Federal CAB tariff for the purposes of furthering the investigation of a possible crime was illegal under the Fourth Amendment standard as announced in both the Alaska and Federal Constitutions." In contending that the search was unconstitutional, Stange assumes that Dahl's status as a security employee for Alyeska Pipeline Security is equatable to that of a governmental agent or official.

Assuming arguendo that Dahl's status was that of a governmental agent or official at the time the carton was opened in his presence, we hold that the superior court reached the correct result in denying Stange's motions to suppress. For, we believe our recent opinion in *State v. Stump*, 547 P.2d 305 (Alaska 1976), is controlling and hold that no constitutional rights of Stange were violated. In short, we have

---

**12.** In support of his taint argument, Stange cites *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

**13.** In support of these propositions, Stange cites *Gambino v. United States*, 275 U.S. 310, 48 S.Ct. 137, 72 L.Ed. 293 (1927); *United States*

*v. Davis*, 482 F.2d 893 (9th Cir. 1973); *Corngold v. United States*, 367 F.2d 1 (9th Cir. 1966); and *Tarnef v. State*, 512 P.2d 923 (Alaska 1973).

concluded that the observations made by Dahl of the contents of the opened carton did not constitute a search.

The facts in *Stump* are somewhat similar to those appearing in the record in the case at bar. There, a Western Airlines employee's attention had been drawn to a particular package, because the method of payment for the shipping was unusual, and because on the day of arrival he had received between four and eight telephone calls from defendants inquiring whether the package had arrived. The employee had also been informed that defendants had shipped a book from San Francisco a few days prior, and had placed an unusually high value on it. Becoming suspicious that the contents might be other than had been declared, he opened the package and found T-shirts and inside the shirts found two plastic bags which contained powder.[14] The airline employee repackaged these items, leaving an end of the box open.

The employee then reported his discovery to his employer who in turn called the Alaska State Troopers. An investigator from the Alaska State Troopers came to the airline facility and was shown the box with one end open. The airline employee removed the contents of the package and showed the investigator the T-shirt which contained the plastic bags. The trooper then reached inside the T-shirt and removed the two plastic bags. He then conducted a field test of the powdery substance and the result indicated that the substance was cocaine.[15]

In *Stump* we held that the first opening and inspection of the packaged by the airline employee was by a private individual and did not violate the defendants' rights. Regarding the later inspection by the Alaska Trooper, this court said:

> We are not persuaded that this inspection stands on any different footing than the first inspection. There is no indication it was done at the direction of the police, nor was there an attempt by the

officer to open the original package. Investigator Harter was handed a T-Shirt from a box opened by Krossa, [the airline employee] and the powder contained in plastic bags was pointed out to him. No police search had occurred up until this time. There was no 'prying into hidden places for that which is concealed' by the officer, and thus the contraband was in plain view. Hence, the second inspection was permissible and the subsequent seizure justifiable. (footnotes omitted)

Still assuming arguendo that Dahl, an Alyeska Pipeline Security employee, was a governmental official or agent at the time the carton was opened for the second time by Kane, we conclude under the rationale of *Stump* that no search by Dahl occurred. In certain respects the facts in the instant case more strongly support the conclusion that no search took place than do the facts in *Stump*. For it is apparent that the Alaska State Troopers in *Stump* played a more active role in the "search" than did Dahl. In *Stump* the trooper reached inside the T-shirt which had been handed to him by the airline employee, and then conducted a field test on the powdery substance. In the instant case there is nothing in the record which would indicate that Dahl was other than a passive observer of the contents of the opened carton.

Whether the carton was resealed or left open (as was done in the *Stump* case) by the airline employee is not, in our view, a significant distinction between the instant case and *Stump*. In both matters the airline employees involved asserted they had authority to open the packages. In neither case did the nonairline investigator appear to direct that the package be opened. Neither Dahl not the investigator in *Stump* assisted in the opening of the packages. More particularly, Dahl was unaware that the carton had previously been opened by Kane nor had he been informed of its contents. Dahl was concerned whether the package could legally be opened, and only after he was advised that it could be by the

---

14. The package that was opened was marked "T-shirts."

15. *State v. Stump*, 547 P.2d 305, 306 (Alaska 1976).

airline personnel, did he suggest that it be opened. After the carton was opened, Dahl observed its contents and left the Wien premises. Thus, under the plain view rationale of *Stump*, we hold that no search occurred when Dahl was shown the contents of the carton.

Also of relevance is our decision in *Bell v. State*, 519 P.2d 804 (Alaska 1974). There we upheld a "search" by an airport security officer, employed by the State of Alaska, of a carton at an airline freight office, on the grounds that the airline employee had already legally opened the package, and therefore the contents of the package were in "plain view." In *Bell*, we said:

> Jones [the airport security guard] was therefore legally justified in removing the torn package from the container. He likewise had the right to remove the other similar material. This resulted in the exposure of the clear plastic sack containing two handrolled cigarettes. The cigarettes were also properly seized as contraband, in view of their appearance and their discovery in the carton containing other contraband items. When the state trooper was called, he likewise had the

right to seize the contents of the container, and therefore his chemical analysis of material from the torn package was proper.[16]

Unlike Dahl who merely viewed the contents of the opened carton which was shown him by Kane, the Wien Airline employee, the airport security officer in *Bell* undertook an active role in removing the contents of the carton once he recognized the first package of contraband inside the carton.[17]

The important fact in the instant case is that the initial opening of the package was performed by an airline employee without instigation from a government official and for a legitimate airline purpose. Once the suspicious contents of the package had been observed by that employee, it was permissible to reshow the contents to Dahl. Such a reshowing did not constitute a search by Dahl under the facts of the instant case. The same reasoning applies to the reshowing of the contents to Trooper Flothe.

We thus conclude that the superior court's denial of Stange's motions to suppress should be Affirmed.[18]

ERWIN, J., not participating.

16. *Bell v. State*, 519 P.2d 804, 808–09 (Alaska 1974).

17. Our disposition has made it unnecessary to decide the interesting question as to whether the federal and Alaska constitutional guarantees against unreasonable searches and seizures, and the concomitant exclusionary rule, applies to "institutionalized private searchers." We also do not reach the question of whether there was sufficient probable cause, independent of Dahl's observations, to hold that Trooper Flothe's affidavit was adequate to withstand constitutional attack.

18. Stange has cited *United States v. Krell*, 388 F.Supp. 1372 (D. Alaska 1975), in support of his contentions. We find that case distinguishable on its facts. In *Krell*, three persons delivered a package for air shipment from Portland, Oregon to Anchorage. They told the airline employee that the package contained stereo equipment and books. Because of the light weight of the package and the long-haired appearance of the shippers, the employees became suspicious and called the police. Upon arrival, the police told the airline employees that they, the police, could not open the package without a warrant, but that the airline employees had the right to open the package to

check for mislabeling. 388 F.Supp. at 1374. One of the airline employees opened the package while the police stood only a few feet away. The employee took a glass jar containing marijuana out of the package. The police officers examined the other containers in the package, and partly opened some of them. The contraband was marked for identification, repacked, and shipped to the destination. 388 F.Supp. at 1374. While the district court recognized that if government agents instigate or participate in a private search, the fourth amendment applies, it stated:

> The *mere presence* of a government officer at a private search of a package by an airline employee on airline property does not constitute sufficient governmental participation to taint the otherwise private search of the employee. . . .
>
> The court finds that this [presence, looking at the containers, and partially opening some containers] was not sufficient participation to taint the search. . . .
>
> However, this does not get the government out of the woods. Remaining are the questions of the purpose of the private search and the government's instigation of it. . . . [E]van *if the government does not encourage the search, if an airline agent searches solely*

*for the purpose of aiding in law enforcement, the search is illegal.* (emphasis added) 388 F.Supp. at 1374–75. One of the airline employees in *Krell* testified "that the only purpose of his search was discovery of drugs to be turned over to law enforcement officers." 388 F.Supp. at 1375. Accordingly, the district court granted the suppression motion.

Significant factors which distinguish *Krell* from the case at bar are these: In the case at bar, the airline employee first opened the package for an independent airline purpose, that is, to determine the identity or address of the consignee. In *Krell*, it appears that the package was first opened at the instigation of the police, who told the airline employees that they could open it to check for proper labeling. The police in *Krell* were present during the first opening of the package. Further, in *Krell*, the airline employee testified that the *only* purpose of his search was discovery of contraband which he intended to turn over to the law enforcement officers. In the instant case, such testimony is lacking, and in fact, the employee who originally opened the package testified that he would not have opened the package solely at the direction of the Alyeska security guard. Thus, we cannot conclude that the airline employee in the case at bar searched the carton solely for the purpose of aiding in law enforcement. It further appears that George Dahl was "merely present" at the reopening of the package, thereby not sufficiently participating in the private search to taint it under *Krell*. 388 F.Supp. at 1374.

Stange also relies on *United States v. Newton*, 510 F.2d 1149 (7th Cir. 1975). There suspicious behavior by a passenger on an incoming flight, whose baggage had been misplaced, caused an airline employee at O'Hare Airport to call her supervisor and the Drug Enforcement Administration in Washington, D.C. Two local agents from the Drug Enforcement Administration were dispatched to the airport, and when the luggage arrived, before it was sent to the baggage claim area of the terminal, airline employees opened the suitcase in the presence of the two federal agents. One airline employee searched the suitcase and found two plastic bags containing a brown powder. He handed the bags to one of the agents who field-tested the substance and obtained a positive reaction indicating the presence of heroin. The airline employee replaced the bag in the suitcase, closed it, and sent it to the baggage claim area. When the defendants claimed the suitcase from the public baggage claim area, they were arrested and charged with possession of heroin with intent to distribute.

In *Newton* the airline employees had no need to search the luggage to ascertain the identity of the owner—one of the defendants had already indicated to the airline personnel that she owned it. Further, there appeared to be no independent airline purpose justifying the search. "There was only one reason why [the airline employees] took the federal agents into their confidence; that was to determine whether the bag contained narcotics and, if so, to turn it over to the agents for their investigative activities." 510 F.2d at 1153.

In the instant instant case, an airline employee conducted his own search of the package in an attempt to identify the consignee without any involvement of the police. This legitimate search of the package, and the discovery of the contents, prompted the employee to call his supervisor. The supervisor called Alyeska, and George Dahl was sent to Wien. Unlike the facts in *Newton*, it is not clear from the record whether the purpose in calling Alyeska was "to determine whether the [package] contained [contraband] and, if so, to turn it over to the [police] for their investigative activities." Further, Dahl had not been told the nature of the contents of the package he observed, only that the packages were "suspicious," and he came prepared with no other background information or testing device.