Gary McCONNELL, Appellant,

v.

STATE of Alaska, Appellee.

No. 3872.

Supreme Court of Alaska.

May 4, 1979.

Walter L. Carpeneti, Asst. Public Defender, Juneau, and Brian Shortell, Public Defender, Anchorage, for appellant.

Patrick J. Gullufsen, Asst. Atty. Gen., Daniel W. Hickey, Chief Pros., and Avrum M. Gross, Atty. Gen., Juneau, for appellee.

## OPINION

Before RABINOWITZ, C. J., and CONNOR, BOOCHEVER, BURKE and MATTHEWS, JJ.

BOOCHEVER, Justice.

Gary McConnell appeals his conviction of possession of a drug for sale, in violation of AS 17.12.010. McConnell contends that the superior court erred in denying his motions to suppress evidence based on alleged illegal search and seizure and illegal arrest. We hold that there was no unreasonable search or seizure. We do not reach the issue of the validity of McConnell's arrest. Accordingly, we affirm his conviction.

On Friday, February 25, 1977, Jim Adams delivered two cardboard boxes to the Western Airlines Air Cargo Terminal at Los Angeles International Airport for shipment to Anchorage, Alaska. The combined weight of the two packages was 69 pounds and they were consigned to Gary McConnell. The air freight bill specified McConnell's address and telephone number in Anchorage. The contents were declared to be "personal effects." An unidentified customer service representative of Western Airlines [hereinafter Western] accepted the packages for shipment. Terry Powledge, another customer service representative with Western, observed the transaction.

Powledge is a person of some notoriety in the field of airline cargo search and seizure. In his capacity as a Western employee, Powledge has uncovered drugs in air freight shipments on approximately thirty different occasions in the span of about two years. Powledge testified that he opens approximately 90 to 100 parcels per month to ascertain if contents have been misdeclared.[1] Powledge's detection of drugs has led to his acquaintance with about a dozen law enforcement officers and a certain familiarity with the law of search and seizure. As a result of his drug discoveries, Powledge has been called upon to testify in criminal proceedings in several different

---

1. The Western Airlines air cargo facility in Los Angeles handles approximately one million pounds of cargo every ten days.

states, including Alaska, for which he has received standard witness fees and sometimes travel expenses. He has received letters of commendation from the Los Angeles Police Department for his discoveries. Powledge has not, however, received direct encouragement to continue his searches from law enforcement personnel nor has he received any direct compensation from a law enforcement agency. Although Western Airlines provides employees with formal instruction on detection of restricted articles, Powledge has not received any special treatment or consideration from Western as a result of his discoveries.

Powledge's prior experience in airline cargo dealings caused him to scrutinize the delivery of the boxes by Jim Adams, the consignor, to the other Western employee. Powledge felt that Adams was "acting somewhat strange." Based on Adams' repetitive speech, exaggerated gesticulation, scribbled handwriting, possibly dilated eyes, and general nervousness, Powledge thought that Adams might be "under the 'influence of something." Adams' behavior raised Powledge's suspicions that the contents of the packages might be misdeclared.[2] Powledge noted the license number of the automobile being driven by the consignor.

Immediately after the consignor departed, Powledge cut open one of the boxes.[3] Powledge was aware from conversations with the police and from past experience that while officers could not open and inspect air freight parcels without a search warrant, he could. He testified, however, that officers had never specifically asked that a particular package be opened. Upon opening one of the boxes, Powledge discovered several plastic trash bags covered with talcum powder and he concluded that they contained drugs. Powledge opened the second box and found essentially the same thing he found in the first.[4] He then opened some of the plastic bags and observed what he believed to be bricks of marijuana.

Powledge and other Western employees had earlier been instructed by Narcotics Division officers that narcotics were being shipped on the airlines and that the police should be notified if any employee discovered drugs being shipped via air freight. Powledge called the airport substation of the Los Angeles Police Department to inform them of his find. Officer Burke of the Narcotics Task Force responded to the call. Powledge had removed some of the marijuana bricks from the opaque plastic trash bags; the bricks were further sealed in clear plastic bags. He placed the visible bricks back in the carton and purposefully left the boxes open;[5] thus, when Officer Burke arrived, the marijuana was in plain view.

Officer Burke seized the two boxes and took them to the Los Angeles Police Department, where the contents were photographed and tested. Two bricks of marijuana were removed to keep as evidence; the remaining bricks were repacked in the same boxes and the boxes were resealed. Officer Burke contacted authorities in Anchorage, and arrangements were made with Investigator Leo Brandlen of the Metropolitan Drug Enforcement Unit (hereinafter

2. Powledge thought that the cartons might contain "contraband of some sort—probably drugs."

3. The right of air freight shippers to inspect packages shipped by them is established in tariffs filed by the carriers or the freight-forwarding agents with the Civil Aeronautics Board pursuant to 49 U.S.C. § 1373(a) (1976). *United States v. DeBerry,* 487 F.2d 448, 449 n.1 (2d Cir. 1973).

4. Powledge's closer examination of the boxes revealed that "the shipment was divided in the two types: one was plastic bags; the other was brick like blocks that were wrapped in white paper that was not transparent in nature."

5. Powledge's reason for arranging the bricks in this manner is revealed by the following interchange:

Q Would you in any way attribute your arrangement of the view of the scene to things that you had learned in discussions with . . . officers, as far as your testimony in other cases?

A I understand that it is desirable that the officers see the contraband when they enter the room, to facilitate some type of court problem. I do understand that.

METRO) in Anchorage to ship the packages to Anchorage on Monday.

On Monday, February 28, 1977, the packages were placed on a Western flight to Anchorage. When they were placed on the airplane, both packages were fully sealed. Brandlen and other METRO officers were on hand at the airport when the shipment arrived. A copy of the Los Angeles Police Department report, attached to one of the boxes, plus a description of the shipment provided by Officer Burke, allowed Brandlen to identify the boxes.

Utilizing the information contained in the Western shipping invoice, Brandlen called Gary McConnell and, posing as a Western employee, notified McConnell that the shipment he was expecting had arrived. McConnell appeared alone an hour and one-half later at the Western air freight terminal and signed for the packages. Brandlen, dressed as a Western employee, loaded the two boxes into the back of McConnell's pickup truck. McConnell departed.

The location of McConnell's residence was known to officers prior to the time he took possession of the boxes.[6] Surveillance teams tailed McConnell's vehicle to his residence. McConnell did not enter his residence nor did he unload the boxes; rather, he remained in his vehicle, which he backed into a parking area.

McConnell left the parking area. Brandlen stopped McConnell, gave him *Miranda* warnings,[7] and asked McConnell to accompany him to the closest police station. The boxes were seized by officers, and McConnell and the boxes were taken to the trooper station. At the station, McConnell was interviewed, placed under formal arrest, and incarcerated. The boxes were then transported to the Lake Hood METRO office, where the damaged box was opened and the contents tested. Both boxes were subsequently secured in the METRO evidence locker. One or two days later the second box was opened and its contents were examined.

At no time during the course of the above events was an arrest or search warrant sought or obtained, either by Los Angeles or Anchorage law enforcement officials.

The superior court found McConnell guilty of possession of a drug for sale upon his plea of nolo contendere.[8] McConnell raises three issues in this appeal. First, he contends that Terry Powledge was acting as a state agent when he opened the boxes consigned to McConnell, thereby violating the fourth amendment's proscription against unreasonable searches and seizures. Second, McConnell argues that Anchorage officers violated the fourth amendment when they failed to obtain a search warrant to open at a later time the boxes seized incident to his arrest. Finally, McConnell contends that his warrantless arrest by officers in Anchorage was not based on probable cause, requiring suppression of the evidence seized incident to the arrest.

## SEARCH BY AIRLINE EMPLOYEE

■ The first issue on appeal is whether Powledge was acting as a private citizen or as a state agent at the time he opened the parcels naming McConnell as consignee. If Powledge was acting as a state agent, his conduct was subject to the warrant require-

---

6. A police computer permitted Investigator Brandlen to find the address that was the site of the call number attached to the packages.

7. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1616, 16 L.Ed.2d 694, 706–07 (1966).

8. McConnell entered his plea of nolo contendere expressly conditioned upon the preservation of the limited right to appeal the superior court's denial of his motions to suppress, thereby satisfying the requirements of *Cooksey v. State,* 524 P.2d 1251, 1255–56 (Alaska 1975). *Oveson v. Municipality of Anchorage,* 574 P.2d 801, 803 n.4 (Alaska 1978), imposed upon *Cooksey* the further requirement that "the parties have stipulated with trial court approval, that our resolution of the issue reserved for appeal will be dispositive of the entire case." We will not apply *Oveson's* additional requirement to this case, since McConnell's plea was entered prior to the decision in *Oveson. See Hunter v. State,* 590 P.2d 888, at 891–892, Opn. No. 1800 (Alaska 1979).

ment in the fourth amendment[9] and the similar provisions embodied in the Alaska Constitution.[10] If Powledge was acting as a private citizen, however, the warrant clauses have no application, for the proscriptions against unreasonable searches and seizures contained in the United States and Alaska Constitutions apply only to governmental action. *Burdeau v. McDowell,* 256 U.S. 465, 475, 41 S.Ct. 574, 576, 65 L.Ed. 1048, 1051 (1921); *Bell v. State,* 519 P.2d 804, 807 (Alaska 1974).

■ In several prior decisions, we have upheld inspections conducted by airline employees because we found that the searches were conducted by private citizens acting for legitimate, employment-related purposes.[11] The general principle of law governing this area was most recently announced in *Snyder v. State,* 585 P.2d 229 (Alaska 1978), where we stated that:

> [S]earches by airline employees, acting for an independent and legitimate airline purpose and not in conjunction with or at the direction of the police, do not violate constitutional prohibitions against unreasonable search and seizure.

*Id.* at 231 (footnote omitted).

■ We believe that *Snyder* is dispositive of the first issue presented by McConnell.

In *Snyder,* we dealt with an airline inspection conducted by the same employee whose status is in issue here: Terry Powledge. In *Snyder,* we concluded that Powledge's previous contact with the police and his previous discovery of drugs were insufficient to warrant treating Powledge as a police agent. 585 P.2d at 232. The background facts as to the relationship between law enforcement personnel and Powledge are the same in *Snyder* as they are in this case and, therefore, provide no grounds for distinction.[12] We conclude, therefore, that Powledge was not acting in conjunction or at the direction of the police. "[P]rior contact, of a general nature, between the state police and airline employees [does] not cause the employees to become agents of the police."

The specific facts surrounding the search in this case are slightly different from the facts disclosed in *Snyder,* but we find that the differences are not of sufficient magnitude to compel this court to hold that Powledge is subject to fourth amendment strictures. In *Snyder,* Powledge testified that the person dropping off the package appeared nervous; that he noticed a "strong perfume odor" coming from the package;

---

9. The fourth amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

10. Article I, section 14, of the Alaska Constitution provides:

> The right of the people to be secure in their persons, houses and other property, papers, and effects, against unreasonable searches and seizures, shall not be violated. No warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

11. *Stange v. State,* 559 P.2d 650 (Alaska 1977); *State v. Stump,* 547 P.2d 305 (Alaska 1976); *Bell v. State,* 519 P.2d 804, 807 (Alaska 1974). *See generally* Feldman, *Search and Seizure in Alaska: A Comprehensive Review,* 7 UCLA–Alaska L.Rev. 75, 77–81 (1977).

12. The one fact brought out in this case, unmentioned in *Snyder,* is that Powledge, at times, was able to "cash in" airline tickets, paid for by states where he was to testify, because Powledge, an airline employee, could fly free on an airline "pass." Appellant argues that this was a "significant monetary inducement effectively made by the state for [Powledge] to engage in wholesale warrantless searches." We disagree. Not all jurisdictions which have requested Powledge to testify have provided him with airline tickets or reimbursed him for all actual travel expenses. Thus, while Powledge has benefited financially in connection with some prosecutions, he has apparently lost money on other occasions. Moreover, when jurisdictions have provided airline tickets, Powledge is many times forced to use these "full fare" tickets because the employee passes may be used only if space is otherwise available on the flight. We do not think the possibility of occasionally cashing in a plane ticket amounts to a "significant monetary inducement" offered by the state to encourage private citizens to violate the rights of others.

and that the name and return address of the sender of the package aroused suspicion. Presented with these facts, the court found that the airline employee had "reasonable and articulable suspicions . . . that the articles were mislabeled or that they contained contraband." 585 P.2d at 232 n.5. This fulfilled the requirement that there be a "legitimate airline purpose justifying the intrusion by the airline employee." *Id.*

In this case, unlike in *Snyder*, there was nothing about the package itself that aroused suspicion,[13] nor was the physical appearance of Adams out of the ordinary. Powledge did, however, relate the facts arousing his suspicion: the consignor's repetitive speech, exaggerated gesticulation, scribbled handwriting, possibly dilated eyes, and general nervousness. He thought that Adams might be under the influence of something. We believe that, presented with these facts, the airline employee had reasonable and articulable suspicions that the articles might be something other than what was declared. Thus, Powledge's intrusion was justified by the presence of a legitimate airline purpose: verification of the contents of the two boxes.[14]

■ At several points in his brief, appellant argues that Powledge was acting with "law enforcement motives" and that in opening the boxes, his "purpose" was to promote law enforcement. It is not clear what McConnell hopes to prove by such argument. Assuming that Powledge was acting with some degree of law enforcement motive, a purpose to enforce the law should not ipso facto convert a private citizen into a state agent for purposes of the fourth amendment. "[A]n airline employee,

like other citizens, has the right, indeed the duty, to refuse to allow the use of private airline services for criminal purposes." *Snyder v. State*, 585 P.2d at 232 (footnote omitted). This test is not whether the employee was acting with some partial motive to enforce the law, but whether he acted "for an independent and legitimate airline purpose and not in conjunction with or at the direction of the police." *Id.* at 231. We hold that when Powledge opened the boxes to verify the contents, he was acting to fulfill a legitimate airline purpose and not in conjunction with or at the direction of the police.

## WARRANTLESS SEARCH OF THE BOXES

McConnell's second point on appeal challenges the warrantless search of the boxes seized from the back of his pickup truck after his arrest. The two boxes were seized contemporaneously with McConnell's arrest. After McConnell was transported to the trooper station, the boxes were taken to the METRO unit office where investigator Brandlen opened the partially damaged box and tested the contents thereof.[15] A day or two later, the second box was opened, yielding further marijuana. McConnell contends that the state's failure to obtain a warrant to open the boxes violated his fourth amendment rights and that, therefore, the evidence must be suppressed.

■ Appellant's argument assumes that the opening of the boxes was an independent police search, and is therefore per se unreasonable if no warrant has been issued and no exception to the warrant requirement applies.[16] This line of reasoning over-

---

13. Powledge did testify that the manner in which the "air bill" was filled out aroused his suspicion, but he never articulated any specific facts indicating how the air bill differed from others.

14. In *Bell v. State*, we noted the valid purposes served by an airline employee's inspection of the contents of a package:

> Graves had cause to inspect the package to detect improper declaration of contents, to ensure that the airline facilities were not being used in the commission of a crime, to

insulate the airline from criminal liability for transporting contraband and to ascertain possible damage.

519 P.2d at 807 (footnote omitted).

15. Although the record is not very precise, it appears that the first box was opened about one hour after McConnell was arrested.

16. *See Erickson v. State*, 507 P.2d 508, 514 (Alaska 1973).

looks the state's contention that the seizure and opening of the boxes was merely a reassertion of physical control over evidence already in police "custody" due to a prior valid search and seizure.[17]

Prior to their arrival in Anchorage, both boxes had been seized and opened by Los Angeles law enforcement officials. They had conducted tests on the contents of the boxes and had removed two bricks of marijuana to preserve as evidence. The boxes were in the custody of the Los Angeles Police Department for two or three days.

The state argues that these facts bring the case within the "reassertion of control" doctrine announced in *United States v. DeBerry,* 487 F.2d 448 (2d Cir. 1973). In *DeBerry,* the nervous behavior of a consignor led an air freight employee to open a suitcase being shipped from Los Angeles to New York City. Upon discovering marijuana, the employee called the Los Angeles Police Department. When narcotics officers responded, the marijuana was in open view. After inspecting the contraband, the L.A. police notified federal authorities in New York and sent the shipment on its way. DeBerry and a codefendant claimed the suitcase in New York and were arrested after they had placed the suitcase in the trunk of a car. The suitcase was seized. After finding the Los Angeles search valid, *id.* at 450, the court analyzed the seizure that occurred in New York:

> It may be argued that the New York seizure was separate and distinct from the California search, and because there was ample opportunity for the New York officers to obtain a warrant for the suitcase's seizure, its warrantless seizure violated the fourth amendment. This, however, would ignore the facts and realities of the situation. The suitcase was seized initially in California by Sergeant Figel-

sky of the Los Angeles Police Department. That seizure although done without warrant was legal, because [the airline employee's] legal inspection in effect put the marijuana in Figelsky's plain view; he, therefore, could seize the contraband upon sight. Figelsky made the seizure by removing one of the bricks of marijuana, marking all the rest of the bricks with his initials, and finally marking the suitcase itself with his initials. He then authorized the suitcase to be shipped on. Even though the suitcase was then in transit, later in the luggage bin, and later still in the freight room, it remained legally "seized" just as much as if it were under the actual physical control of the police. In fact, except for the time that it was actually in the airplane's belly, it was under the close surveillance of the police. Thus, when the agents and police in New York removed the bag from the back seat of the car appellants were in, they were not making an initial seizure, but rather were merely reasserting control of the suitcase which had already been seized for legal purposes and which was merely being used as bait. Accordingly, no warrant was required.

*Id.* at 450–51 (citations and footnotes omitted). Although the language of the court speaks only of "seizure," the court upheld the lower court's admission of "the bag and its contents." *Id.* at 450. Implicitly, the court upheld the subsequent search of the suitcase itself.[18]

The unspoken thesis of *DeBerry* is that there is no search or seizure when evidence, once properly seized, is subsequently seized after identification and arrest of persons believed to be committing the crime. *DeBerry's* reasoning has been followed in several subsequent decisions.[19] In each of

---

**17.** The state's argument assumes that the initial discovery of the narcotics in Los Angeles was valid as a "private person search," and the search by the Los Angeles police was valid because the marijuana was in plain view.

**18.** The *DeBerry* opinion does not reveal the precise circumstances as to when and where the suitcase was opened in New York.

**19.** *United States v. Ford,* 525 F.2d 1308, 1312–13 (10th Cir. 1975) (alternative holding); *United States v. Edwards,* 443 F.Supp. 192, 201 n. 7 (D.Mass.1977) (alternative holding); *United States v. Hillan,* 381 F.Supp. 1171, 1173 (N.D. Tex.1974); *State v. Edwards,* 197 Neb. 354, 248 N.W.2d 775, 777 (1977).

these cases, the courts viewed the reacquisition of the contraband not as a second seizure, but rather as a reassertion of physical dominion over evidence already rightfully in the government's possession.

We believe that, properly limited, the *DeBerry* doctrine is a sensible rule which reasonably accommodates the values protected by the fourth amendment and the interests of effective law enforcement.[20] We find unpersuasive the arguments advanced by appellant for rejecting the rule.[21]

The reasoning in *DeBerry* mandates that its application be limited to the following narrow set of circumstances. First, contraband must be placed in transit from one person to another. Second, the contraband must be initially discovered through lawful means, such as a search by a private person. Third, law enforcement officials must come into lawful possession of the contraband. Seizure of contraband after it is observed in plain view is one method of acquiring lawful possession. Fourth, authorities in possession must forward the parcel to authorities at the intended destination under controlled circumstances. Thus, the receiving authorities must have information enabling them to identify the parcel when it arrives, such as a description of the container and its contents. Fifth, the parcel must be under security or under reasonably continuous surveillance by authorities once it arrives at its destination. The reasonably continuous surveillance must continue after the consignee claims the container. Finally, any

---

**20.** The realities of modern law enforcement support the rule announced in *DeBerry*. If police rightfully come into possession of contraband which is supposed to be transferred from one person to another, they might, of course, lawfully seize the contraband and refuse to send it on its intended journey. In a justifiable attempt to apprehend others involved in the criminal scheme, however, the police may, under controlled circumstances, send the contraband to the designated consignee in order to gather further facts and establish probable cause to arrest other participants. To require officers to obtain a warrant to seize and search parcels which are in their constructive control and which were once validly seized and searched would elevate form over substance.

**21.** McConnell argues that the doctrine is contrary to Alaska law, that it is not supported by the reasoning usually advanced to dispense the warrant requirement, and that its adoption would create significant problems of application.

While no Alaska case has adopted or mentioned the "reassertion of control" doctrine, we do not believe that the doctrine is contrary to Alaska law. The "plain view" cases cited by appellant do not meet the substance of the *DeBerry* doctrine, which is based on the continuing nature of an initially valid seizure and search. The state does not seek to justify the seizure and search by Alaska officers on the basis of the "plain view" doctrine; it merely draws an analogy between the plain view doctrine and the reassertion of control doctrine. Appellant's second argument against the *DeBerry* doctrine—that it is unsupported by the rationale behind other exceptions to the warrant requirement—is wide of the mark. The *DeBerry* doctrine is not a new exception to the warrant requirement. Its reasoning rests on the premise that there is no second seizure or search when the government reacquires possession of contraband once validly seized.

Appellant's third criticism of *DeBerry* is that adoption of the doctrine would create significant problems in application due to multi-jurisdictional involvement of law enforcement personnel and courts. Appellant's argument that searches validly conducted under the laws of one state might violate the laws of another state is not a compelling reason for rejecting the doctrine. We will apply the search and seizure law of the state having the more demanding standards, thus providing maximum protection for the defendant. Although McConnell's argument with respect to multi-jurisdictional involvement of law enforcement personnel is stronger, we are not convinced that it requires rejection of the doctrine. Theoretically, it may be difficult to articulate how authorities in different jurisdictions maintain collective custody over contraband as it passes through or over multiple jurisdictions on an interstate journey. We decline to create unnecessary stumbling blocks to inter-jurisdictional police cooperation in the name of completely abstract theoretical difficulties. *See United States v. DeBerry,* 487 F.2d at 451 n. 4. Moreover, although most cases invoking the *DeBerry* doctrine have dealt with shipments between federal officers or between local officers within the same state, at least one case has applied *DeBerry* to a situation where contraband was shipped interstate from one local law enforcement unit to another. *See United States v. Ford,* 525 F.2d at 1312–13 (alternative holding).

substantial break in the chain of custody will vitiate the lawfulness of the search.[22]

■ We agree with the state that the facts of this case fall within the confines of the *DeBerry* rule. We have already concluded that the contraband was lawfully discovered by Terry Powledge. Officer Burke of the Los Angeles Police Department lawfully seized the contraband, which was in plain view. While the boxes were in the custody of the Los Angeles police, Officer Burke contacted Anchorage authorities and provided them with a description of the boxes, their contents, and the shipping invoice number. He attached a police report to one of the boxes. Finally, he told Anchorage authorities what flight the boxes would arrive on. METRO personnel were informed of the arrival of the package by Western employees. They took possession of the boxes and photographed them. Officer Brandlen personally loaded the boxes into McConnell's pickup when he arrived to claim the cargo. McConnell was under reasonably continuous police surveillance as he drove home. McConnell was arrested and the boxes were seized without any substantial break in the chain of custody. Thus, we hold that the boxes were validly seized and searched pursuant to the *DeBerry* reassertion of control doctrine.[23] The subsequent seizure and opening of the boxes by Anchorage authorities did not constitute a second, distinct search subject to the fourth amendment's warrant requirement.

## PROBABLE CAUSE TO ARREST

Appellant McConnell's last point on appeal challenges the validity of his arrest. He contends that his arrest was invalid because not based upon probable cause and because an arrest warrant was not obtained. McConnell challenges his arrest in order to establish a basis for suppressing the evidence seized by officers when he was arrested.[24] McConnell assumes that the seizure and subsequent search of the boxes may be upheld, if at all, upon the exception to the warrant requirement that allows a limited search incident to a lawful arrest.[25] McConnell hopes to show the invalidity of his arrest which, in turn, would lead to the suppression of the evidence seized as the tainted fruit of the primary illegality. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

■ We find it unnecessary to reach the issue of the validity of McConnell's arrest. As appellant's own argument demonstrates, this issue is of importance only if we rely on the search incident to arrest exception to uphold the seizure and search in this case.[26] We have already concluded,

---

**22.** The time during which the parcel is in transit by use of a regular and reliable means of transportation does not break the chain of custody. *See Racy v. State,* 520 P.2d 375, 378 (Okl.Cr.1974) (transmission of contraband through U.S. mail). Moreover, possession by the consignee or others to whom the consignee delivers the package would not break the chain of custody so long as the parcel remains under reasonably continuous surveillance. Minor gaps in the continuous surveillance, while going to the weight of the evidence, would not bar seizure and later introduction of the contraband into evidence. *See Sullivan v. Municipality of Anchorage,* 577 P.2d 1070, 1073 (Alaska 1978); *Wright v. State,* 501 P.2d 1360, 1372 (Alaska 1972) (by implication).

**23.** The United States Supreme Court decision in *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), is not in conflict with the *DeBerry* doctrine. In *Chadwick,* the trunk was seized and then searched for the first time after it had arrived at its intended destination and after the defendant had been arrested. Unlike *DeBerry,* there was no prior valid search and seizure.

**24.** McConnell thus states his argument:
THE SUPERIOR COURT ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS BASED UPON THE WARRANTLESS ARREST OF THE DEFENDANT WITHOUT PROBABLE CAUSE TO ARREST.

**25.** *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *Erickson v. State,* 507 P.2d 508, 515 (Alaska 1973).

**26.** Proof of the invalidity of the arrest would serve no purpose independent of providing grounds for suppressing the evidence. It is well-established that an illegal arrest or detention does not bar the state from prosecuting criminal conduct or void a subsequent conviction. *See Gerstein v. Pugh,* 420 U.S. 103, 119, 95 S.Ct. 854, 865, 43 L.Ed.2d 54, 68 (1975); *Ker v. Illinois,* 119 U.S. 436, 439, 7 S.Ct. 225, 227,

however, that the warrantless seizure and search of the boxes is valid under the reassertion of control doctrine. Thus, even were we to assume the invalidity of McConnell's arrest, it would not provide a basis for suppressing evidence already lawfully in the custody of the police.

The conviction is AFFIRMED.

RABINOWITZ, Chief Justice, dissenting.

I dissent from the majority's conclusion that Powledge was acting as a private citizen at the time he opened the parcels addressed to McConnell as consignee. Given my conclusion that Powledge was acting as a state agent, it follows that his conduct was subject to the warrant requirements found in both the Federal and Alaska Constitutions.

In *Snyder v. State,* 585 P.2d 229, 232 (Alaska 1978), this court observed that "[w]hile the facts of this case approach the outer limits of permissible police involvement, we conclude that Powledge's conduct did not constitute governmental activity." (footnote omitted) It is my opinion that

the outer limits of permissible police involvement have been exceeded here. For, unlike the majority, I am persuaded that Powledge had a substantial financial motive, since in a significant number of cases he was able to "cash in" airline tickets, paid for by states where he was to testify. Powledge was able to do this because as an airline employee he could fly free on an airline "pass." It is this factor, when added to the facts recounted in *Snyder* concerning the numerous searches of this sort conducted by Powledge and his ongoing relationship with law enforcement authorities, which has led me to the conclusion that Powledge's actions cannot be characterized as those of a private citizen. I would therefore reverse the superior court's denial of McConnell's suppression motion.

30 L.Ed. 421, 423 (1886). At this stage, McConnell's remedy for an alleged invalid arrest is a civil action against the law enforcement officers. *See Ingraham v. Wright,* 430 U.S. 651, 680 n. 48, 97 S.Ct. 1401, 1417 n. 48, 51 L.Ed.2d 711, 736 n. 48 (1977).