UNITED STATES of America,
Plaintiff–Appellee,

v.

Lacey Lee KOENIG and Lee Graf,
Defendants–Appellants.

Nos. 87–1474, 87–1598.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 10, 1987.

Aug. 31, 1988.

Thomas A. Durkin, Chicago, Ill., Joe R. Vespa, Peoria, Ill., for defendants-appellants.

Mark Stuaan, Asst. U.S. Atty., J. William Roberts, U.S. Atty., Peoria, Ill., for plaintiff-appellee.

Before CUMMINGS, CUDAHY and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

The well-known overnight courier Federal Express opened a suspicious package deposited with it for delivery. It contained a white powder and the carrier notified the federal Drug Enforcement Administration ("DEA"). A field test by a federal agent indicated cocaine. The DEA, in coordination with Federal Express, performed a controlled delivery of the package to the intended recipient. In the course of the package's travels through the Federal Ex-

press system, it was specially handled by the courier's personnel. At its terminus, in Peoria, Illinois, the package was opened for the last of many times, jointly by a federal agent, a member of the Illinois Police, and a Federal Express employee. The package was then delivered, according to its address, to the residence of Ms. Koenig. Shortly afterward the DEA obtained and executed a search warrant on the residence and seized several items including the package. While the police were searching Koenig's apartment, defendant Graf knocked on the door and the officers allowed him to enter. The officers immediately "frisked" Graf and found $1,800 in cash on his person. (Graf has not challenged the legality of the search.)

On September 22, 1986, a federal grand jury returned an indictment charging both Koenig and Graf (along with two other co-defendants whose participation is not relevant here) in connection with the shipping of cocaine. The indictment charged Koenig and Graf with conspiracy to distribute cocaine, 21 U.S.C. § 841(a)(1); and with possession of cocaine, 21 U.S.C. § 844(a); and charged Koenig alone with attempting to possess cocaine with intent to distribute, 21 U.S.C. § 846. Koenig, joined by Graf, moved before trial to suppress the evidence found in the package arguing that it was the fruit of an illegal search. They argue that the police required a warrant to examine the package at its origin, notwithstanding the initial opening of the parcel by Federal Express. Further, they contend that a warrant was required for the reopening of the package in Peoria, Illinois, prior to its delivery because the package had left the hands of the DEA in transit. The district judge denied the motion, and Koenig entered a conditional plea of guilty to the charges of conspiracy to distribute cocaine and attempt to possess cocaine. The plea was conditioned upon her right to appeal the denial of the suppression motion. Fed.R.Crim.P. 11(a)(2). Graf was tried and convicted of conspiracy to distribute cocaine, as well as on a possession charge not part of this appeal. Graf argues that the evidence only showed his relationship with Koenig was that of buyer and seller, thus he should not have been convicted as a coconspirator in the conspiracy to distribute. He also adopts Koenig's arguments on the impropriety of admitting the cocaine in evidence. We agree with the district judge and hold that he properly refused to suppress the reception of the package and its contents in evidence, and that the evidence received was sufficient for a jury to convict Graf as a coconspirator.

I

On July 17, 1986, Federal Express Senior Security Specialist Jerry Zito was at the West Palm Beach Federal Express station on what he described as a "routine station visit." While there, he conducted a visual inspection of packages received over the counter and detected an odor of laundry soap or fabric softener emanating from one of the boxes. Cocaine is ofttimes packed in laundry products to mask its smell. His curiosity piqued, Zito checked the West Palm Beach, Florida, telephone directory and found no listing for the shipper of record. He inquired of another employee about the address the shipper had given and was informed that it was fictitious. Zito proceeded to open the package. Inside, wrapped in fabric softener sheets, he found two transparent plastic bags containing white powder. He contacted the local DEA office. Special Agent Weitz responded and field tested the powder. The test indicated cocaine.

After replacing all but a small sample of the cocaine with cornstarch, Weitz repacked the bags and marked the package. After consulting with DEA Agent Hershey in Springfield, Illinois, Weitz returned the package to the West Palm Beach Federal Express office with instructions to perform a controlled delivery. The package was routed through the Federal Express hub in Memphis, Tennessee. While in Memphis, the package was kept in a Federal Express safe and was opened on two occasions by Federal Express employees to check its contents. The box was once again opened upon its arrival in Peoria, Illinois, on July 19, this time by Agents Hershey and Simmons of the Illinois State Police and a

Federal Express employee. Hershey field-tested the remaining sample of the original powder, again with positive results for cocaine. The package was again sealed and then delivered to its intended recipient, Koenig. A federal search warrant was then obtained and executed on Koenig's apartment, resulting in the seizure of several items including the Federal Express package containing the packets of cornstarch and cocaine samples.

## II

■ Koenig and Graf ask this court to reverse the district court's refusal to suppress the evidence found in the package. Graf's appeal on this point is easily dismissed. Because Graf was neither the sender nor the addressee of the package and thus has no privacy right in it, he therefore has no standing to make the request. On appeal, he fails to point to any other source of a personal privacy interest in Koenig's mail. We need not decide whether a privacy interest could be recognized given proof of an ownership interest in the contents of the parcel and a showing of the ability to control the parcel once delivered. A wife, for example, might have a privacy interest in an envelope containing a life insurance policy covering both husband and wife that was sent to the household addressed to the husband. Graf fails to qualify for that sort of standing, however, because he fails to establish even a limited privacy interest in the package. Graf never asserted that he was part owner of the drugs in transit. To the contrary, he has consistently argued that he was never a part of the conspiracy to distribute, but only a frequent customer of Koenig. His position is that his relationship with Koenig was no more than a buyer/seller, the mandatory implication being that he had no interest, title or control over the drugs Koenig obtained until such time as he had purchased them from her. Graf also points out that "[t]here is ... no evidence that [he] at any time resided with any of the principals." Graf Brief at 9. Consequently, he could not have exerted control over Koenig's mail upon delivery. Without a privacy interest in the package,

Graf lacks standing to assert Fourth Amendment objections to the police conduct. It is well established that Fourth Amendment rights are "personal rights which ... may not be vicariously asserted." *Alderman v. United States,* 394 U.S. 165, 174, 89 S.Ct. 961, 966, 22 L.Ed.2d 176 (1969). Graf's only interest in suppressing the package and its contents is to avoid its evidentiary force against him. A similar interest exists in every defendant with regard to every piece of evidence the prosecution may adduce and is plainly not protected by the Fourth Amendment. *Jones v. United States,* 362 U.S. 257, 261, 80 S.Ct. 725, 731, 4 L.Ed.2d 697 (1960), *overruled on other grounds, United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980).

■ Unlike Graf, Koenig has a privacy interest in her mail and so may test the legality of the conduct used to search and seize the same. Her major contention on appeal is that Federal Express employee "Zito was acting as a *de facto* instrument or agent of the government at the time of the search." As such, she maintains that any search he conducted must be evaluated as if performed by a federal official. Under the circumstances, Zito's warrantless search was unreasonable, says Koenig, and so any evidence discovered must be excluded from subsequent criminal proceedings. For the purposes of this appeal, we may assume that, had Zito been a federal agent, his warrantless search would have been unreasonable. *But see United States v. Ford,* 525 F.2d 1308, 1312–13 (10th Cir. 1975) (during a controlled delivery of lost luggage by an airline, warrantless seizure justified by exigent circumstances, as the time delay to obtain a warrant might have tipped off the recipients to the presence of the police). It matters not because we reject the major premise of Koenig's argument and hold that Zito performed the initial search as a private citizen.

It is axiomatic that the Fourth Amendment does not apply to private entities. Like much of the Constitution, "it was intended as a restraint upon the activities of sovereign authority." *Burdeau v. McDo-*

*well,* 256 U.S. 465, 475, 41 S.Ct. 574, 576, 65 L.Ed. 1048 (1921). The Supreme Court has held that a wrongful search or seizure conducted by a private party does not rise to a constitutional violation of the Fourth Amendment, *Walter v. United States,* 447 U.S. 649, 656, 100 S.Ct. 2395, 2401, 65 L.Ed. 2d 410 (1979), nor prevent the government from using evidence that it has acquired lawfully. *Coolidge v. New Hampshire,* 403 U.S. 443, 487–90, 91 S.Ct. 2022, 2048–50, 29 L.Ed.2d 564 (1971). Here, Zito put the contents of the package in plain view of the DEA. Agent Weitz's actions are therefore unassailable on Fourth Amendment grounds. *United States v. Jacobsen,* 466 U.S. 109, 118–22, 104 S.Ct. 1652, 1659–61, 80 L.Ed.2d 85 (1983). The only question, then, is whether Zito "must be regarded as having acted as an instrument or agent of the state" for the purpose of evaluating his initial search of the package. *Coolidge,* 403 U.S. at 487, 91 S.Ct. at 2048.

Koenig concedes that she bore at least the burden of establishing a *prima facie* case that the search was instigated by a governmental agent rather than a private entity. She also bore the ultimate burden of persuasion, *see Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 267, 84 L.Ed. 307 (1939); *United States v. Gumerlock,* 590 F.2d 794, 799 & n. 16 (9th Cir.1979) (en banc), although it is our belief that not even a *prima facie* case has been made: Koenig has not introduced any evidence demonstrating that the government influenced Zito to conduct the initial search; she has not even hinted at any use of governmental power to influence Zito's actions and without this, Zito cannot accurately be characterized as an instrument of the government.

Instead, Koenig relies on *United States v. Walther,* 652 F.2d 788, 791–92 (9th Cir. 1981), for the proposition that a private search by a common carrier made with the intent to aid law enforcement authorities, and with the government's knowledge, must be deemed state action. However, this circuit has recently discussed *Walther,* and we do not read that case as broadly as Koenig urges. *See United States v. Feffer,* 831 F.2d 734, 738–39 (7th Cir.1987). In *Walther,* the Ninth Circuit reviewed the search of a suspicious overnight case by an airline employee. The court expressly disavowed setting forth a specific formula for determining whether the airline employee could be considered an "instrument or agent" of the government, and stressed that the determination must be made on a case-by-case basis by the district judge, and reviewed under the deferential "clearly erroneous" standard. *Walther,* 652 F.2d at 791. Then, in reviewing the district court's factual finding that an agency relationship had been established in that case, the appellate court approved the district court's analysis of the government's knowledge of and acquiescence in the conduct of the private searcher as "critical factors" in deciding whether the "instrument or agent" relationship had been established. *Id.* at 793. In *Feffer,* this circuit agreed that "two critical factors in the 'instrument or agent' analysis are whether the government knew of and acquiesced in the intrusive conduct and whether the private party's purpose for conducting the search was to assist law enforcement agents or to further [its] own ends." Other useful indicators are whether the private actor performed the search at the request of the government and whether the government offered a reward. *Feffer,* 831 F.2d at 739–40. In all cases, however, the "court's analysis must be made on a case-by-case basis and in light of all of the circumstances." *Id.* at 739. Koenig argues in essence, that *Walther* expressed a simple, brightline rule: knowledge plus acquiescence equals agency. As this circuit made clear in *Feffer,* no such simple rule governs this issue.[1] Instead,

---

1. An examination of the common law of agency is helpful in demonstrating why no simple formula should be applied. An agency relationship "results from the manifestation of consent by one person to another that the other shall act on his [or her] behalf and subject to his [or her] control, and consent by the other so to act." Restatement (Second) of Agency § 1 (1958). Although mutual consent (either express or implied) is necessary to the relationship, neither consideration nor formal offer and acceptance are required. *Id.* at §§ 15–16. Ultimately, the existence of an agency relationship is a question of fact. *Id.* at § 1 comment b. We do not

the question whether a private searcher acts as an instrument or agent of the government must be made by the trial court on a case-by-case basis, and may be reversed only if clearly erroneous. *Id.; see also, e.g., Walther,* 652 F.2d at 791–92; *United States v. Newton,* 510 F.2d 1149, 1153 (7th Cir.1975) ("issue is to be determined by the facts surrounding the search"); *United States v. Issod,* 508 F.2d 990, 993–94 (7th Cir.1974) (same).

Koenig argues here that Federal Express lacks a sufficiently compelling private interest in opening packages it suspects to contain drugs. In support she cites a memorandum written by Zito to senior managers explaining the problem Federal Express has with use of its services to ship illegal items of all sorts. The memo instructs managers to contact Zito if approached by law enforcement officials and notes the value of good relations with law enforcement agencies.[2] Other evidence shows a history of cooperation between Zito and Federal Express on one hand and various law enforcement authorities on the other.

Since Zito began his employment with Federal Express, he has contacted the DEA at least eight times.[3] He has testified in two DEA cases. The district court found, however, that Zito never worked as an informant for the DEA, has never been rewarded by the DEA for his aid, nor even discussed with law enforcement authorities what to look for in Federal Express shipping. Koenig also introduced an affidavit showing contact between Federal Express and the DEA at the national level. Representatives from two DEA offices apparently met with Federal Express personnel to assist in the development of a drug shipper's profile. The same affidavit notes that "[t]hose parties attending these meetings were apprised of DEA's national policy regarding DEA interaction with common carrier personnel. Specifically, the DEA does not request that common carriers broaden the scope of their search to include drugs or related contraband, but will respond to calls to assist when suspected contraband is found."[4]

assert that the constitutional issue before us necessarily must be governed by the common law definition of agency. However, the highly factual nature of the inquiry supports our position that the case before us may not be resolved by the overly simplistic approach suggested by Koenig's reading of *Walther.*

2. The text of the memo in full reads:
   "SUBJECT: EMPLOYEE CONTACT WITH POLICE
   An unfortunate situation exists in this Company, and in any company that deals with freight, especially companies who provide an overnight service. There are persons who use companies like Federal Express to ship drugs, stolen property, fraudulent documents and any other related illicit materials. This provides the shipper with the convenience of rapid, guaranteed delivery of their merchandise, along with a certain degree of anonymity. Because of this situation, FEC employee contact with law enforcement officials is inevitable, although rare.
   If you as a manager, or one of your personnel, are contacted by a law enforcement official, it is imperative that I be contacted immediately so that I may deal with the situation at its onset, to insure that the FEC employees welfare is safeguarded.
   Please remember that our relationship with law enforcement agencies is an extremely valuable asset, therefore, at all times attempt

to be courteous and develop an understanding of the job they are trying to do."

3. The parties in their briefs and at oral argument were unable to clarify what is meant by "contact."

4. The affidavit of Raymond L. Vinsik, Chief, Cocaine Investigations Section, DEA, reads in full:
   "met with Federal Express Company (FEC) security executives, at FEC's request, in January 1984, to assist FEC in compiling a drug shipper's profile for use by FEC personnel. As a result of that meeting, the DEA Memphis Resident Office is routinely alerted by Federal Express Corporate Security of all suspected drug interceptions. It is my understanding that this routine is still followed. Also, in June 1983, the DEA Memphis Resident Office assisted FEC in initiating a program with the local police involving the periodic use of FEC of a local police drug sniffing dog to assist them in their anti-drug efforts. Our inquiry also revealed that between 1979 and 1984, the Air Transport Association of America and the U.S. Civil Aeronautics Board held meetings to discuss operational interaction between airline employees and Government law enforcement agents. DEA Headquarters representatives, FEC security executives, representatives from other government entities and common carriers participated in these meetings. Those parties attending these meetings were

■ The district court found that on this background of information, Zito's search can only be reasonably considered as that of a private party. It found that Federal Express acted for legitimate reasons of its own when examining packages for drugs. The conclusion is not clearly erroneous. *Anderson v. City of Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). It is Federal Express corporate policy to protect its employees from "all types of criminal activity" [5] by opening and inspecting packages.[6] Corporate policy also provides for the opening and inspection of packages "on a random and periodic basis" and for contacting the authorities if a controlled substance is found.[7] The district judge found significant the threats of retaliation against a Federal Express employee who lost a package containing drugs, of force being used against an employee in an effort to steal from him a package containing drugs, and the possibility that Federal Express employees might succumb to temptation and themselves steal such packages. Federal Express certainly has the right to guard against these possibilities. Courts do not assess the commercial wisdom of corporate policy in this context, but only its subjective importance to the employer. *Cf. Pollard v. Rea Magnet Wire Co.*, 824 F.2d 557 (7th Cir.1987). The question is why the employee behaved as he did, not whether the employee's behavior displayed good business sense. Nothing in the record suggests that Federal Express searched Koenig's package, or any other package, for reasons other than what it perceived as its own business interest in safety and security, as discussed above. Zito's memo deals mainly with the need to channel through him all contacts with law enforcement personnel; it does not discuss when or why employees should open packages. The affidavit relating meetings between DEA and Federal Express itself explicitly excludes the possibility of reading it as a request for private carriers to search parcels as a surrogate for the government. And the fact that the DEA may have aided Federal Express in the development of a drug shipper profile does not establish that Federal Express would use the profile at the government's behest, rather than for its own, private purposes. Presumably Federal Express would desire the best profile it could obtain, the better to stem the tide of drugs shipped through its facilities. Use of an effective drug shipper profile, whatever its source, is consistent with a private business interest in protecting employees from contact with drug shipments.

■ We affirm the district court's finding that Koenig failed to prove the conditions she concedes are necessary to convert the actions of a private employee into an action of a governmental agent: Although the DEA may have known of Federal Express's security search policy, it is clear that Federal Express acted for its own private, business purposes. We note, however, that the factors Koenig identified are not independently sufficient to convert a private search into a governmental search. To effect such a transformation, a defendant must prove some exercise of governmental power over the private entity, such that the private entity may be said to have acted on behalf of the government rather than for its own, private purposes. *Cool-*

apprised of DEA's national policy regarding DEA interaction with common carrier personnel. Specifically, DEA does not request that common carriers broaden the scope of their search to include drugs or related contraband, but will respond to calls to assist when suspected contraband is found. Finally, DEA appealed to common carrier security managers at the national level to have all their employees recognize and perform their civil duty in assisting drug law enforcement when it was appropriate."

5. Policy No. G10–5: "It is Federal Express policy to protect its personnel, its customers, and

the company against all types of criminal activity (both internal and external) and acts of nature by the development and application of appropriate methods of prevention."

6. Policy No. G10–20: "It is the policy of Federal Express to open and inspect packages within the Federal Express system for safety and security reasons."

7. Policy No. G10–20–1 states that corporates security "opens and inspects packages on a random and periodic basis. If an illegal substance is found, contact authorities."

*idge,* 403 U.S. at 488–89, 91 S.Ct. at 2049. Such was the case in *Walther* itself; the airline employee involved in that case had been a paid DEA informant for five years and, the trial court found, the employee probably expected compensation for the search at issue. It is only by the exercise of some form of control that the actions of one may be attributed to another. Restatement (Second) of Agency § 14 (1958). Mere knowledge of another's independent action, does not produce vicarious responsibility absent some manifestation of consent and the ability to control. *See Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) (a utility's termination of a customer for nonpayment of charges was not attributable to the state even though the utility was heavily regulated and enjoyed a partial monopoly under state law, where the state "never even considered" the utility's termination procedure which was at issue.)

■■■ For this reason, Koenig's reliance on *United States v. Davis,* 482 F.2d 893 (9th Cir.1973) also falls short. There, the Ninth Circuit found that an airline's search of persons and their carry-on bags prior to boarding an airplane had to be measured against the Fourth Amendment. The airline had searched pursuant to a governmentally directed nation-wide program to combat hijacking. We agree that legal compulsion by statute, regulation, or executive order may provide the control over private entities necessary to treat them as governmental agents. We disagree, however, that a governmental policy such as fighting drugs or preventing hijackings is itself enough to provide the necessary level of government control, even if governmental and private entities voluntarily cooperate. *See Jackson,* 419 U.S. at 354–55, 95 S.Ct. at 455 (utility regulation insufficient to make termination procedure state action). Private carriers need not be treated as governmental agents unless it can be established that they are induced to conduct a private search by some government action. *Cf. Coolidge,* 403 U.S. at 488–89, 91 S.Ct. at 2049 (voluntary cooperation with police by private individual does not, of itself, constitute a search and seizure). The social policies pursued by the government will often coincide with the social ideals of many private persons; the coincidence of these goals falls short of establishing that the private persons are controlled by the government. Quite the contrary, it is a reflection of our democratic system in proper working order, the government acting as agent of the people. Private parties may, of their own accord, pursue the same objectives they have set for their elected officials without acquiring the legal status of governmental agent. Consequently, once the court is satisfied that a private entity has conducted a search for its own, private reasons and not as an instrument or agent of the government, the specific reason for the search no longer matters. A company may conduct a search for security reasons or simply out of its own interest in combatting crime, as long as the reason for the search is not circumscribed by the constitution. *Jacobsen,* 466 U.S. at 113, 104 S.Ct. at 1656; *Coolidge,* 403 U.S. at 487–90, 91 S.Ct. at 2048–49.

Application of the correct rule in the future will avoid what we perceive as the fundamental flaw in Koenig's argument; according to Koenig, the government should have been required to prove that Federal Express had no intent to assist in the government's enforcement of the criminal laws to avoid having Federal Express deemed its agent. But, of course, it is every citizen's civic duty to do what he can to aid in the control and prevention of criminal activity, and "it is no part of the policy underlying the Fourth and Fourteenth Amendments to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals." *Coolidge,* 403 U.S. at 488, 91 S.Ct. at 2049.[8] Concern

---

**8.** The so-called "silver platter doctrine" is not to the contrary. In some situations, evidence illegally obtained by state police cannot be used by federal officials. *Gambino v. United States,* 275 U.S. 310, 48 S.Ct. 137, 72 L.Ed. 293 (1927). The evidence must be presented to federal officials on a silver platter by state authorities i.e., without any federal participation in the underlying illegal search or seizure, to be admissible in federal prosecutions. *Lustig v. United States,*

about the effects of crime on the public at large is not a vice which one must assume signifies a conspiracy with the government, but a cherished, commonly held, and wholesome virtue and implies no more than a properly tuned social conscience. Zito testified in another case that Federal Express routinely seizes and destroys quantities of drugs too small to interest the DEA. This suggests that the corporation is always concerned about the illegal transportation of drugs, even when the law enforcement authorities are not. The policy-makers of Federal Express may be expressing a moral conviction against condoning and aiding the violation of laws. Or, they may see the profit in managing the corporation so that it appears to the public (customer pool) as socially responsible. Either way, we see no reason to treat anti-crime efforts for the benefit of the citizens of these United States as a whole (instead of just company employees) as deputizing the person or corporation as a governmental agent. It is simply not true that only the government can care about crime.[9] In a sense, because we in America live in a democracy, the individual citizens *are* the government, acting through their agents, their elected representatives. This is perhaps the most salient feature separating our system of government from those such as South Africa, which actively exclude most of their people from the policy-making process. And, because we have a government of the people, by the people, and for the people, it should come as no surprise when the goals of private individuals or organizations coincide with those of the government. However, this happy coincidence does not make a private actor an arm of the government.

III

Koenig also challenges the warrantless search of the package in Peoria, Illinois, prior to delivery to her. She asserts that, having let the package out of their immediate control as it traveled throughout the Federal Express system, the DEA was required to have a valid search warrant before opening it again when it reached Peoria. In her view, the Peoria search must be viewed in isolation: Although the law enforcement personnel had marked the package for positive identification, and knew the contents of the package because of their previous searches, Koenig believes this establishes nothing more than probable cause for a warrant and not an excuse for a warrantless search. The government gave two responses to the trial court: 1) Koenig no longer had Fourth Amendment interest in the package after the package was opened and the contraband discovered, and 2) the Federal Express employees who specially shepherded the package through the system were constructive federal agents in order that they might ensure that the package was in the "continuous con-

338 U.S. 74, 79, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949). We note that the rule vindicates core Fourth Amendment policy because state police are state actors and so their actions may independently violate the Fourth and Fourteenth Amendments even if they are not viewed as instruments of the federal authorities. The same cannot be said of a private corporation like Federal Express. Moreover, *Lustig* treats even state police as private individuals for purposes of suppressing federal evidence if the federal officials have not played a part in the underlying violation. The Supreme Court has drawn narrowly the collateral exclusionary effects of questionable searches and seizures consistent with a balance of deterring official misconduct on the one hand and deterring crime (by aiding prosecutions through the admission of evidence) on the other. We are bound to effectuate the enunciated constitutional balance.

9. Market forces will naturally limit private anti-crime efforts. If the private anti-crime conduct is itself illegal, the private individual will be liable to injured parties, notwithstanding his good intentions. Federal Express is not exposed to any liability in this case because it reserved the right to search the package in the contract of carriage. Nevertheless, it is not inconceivable that some potential customers will shy away from Federal Express because they do not want to chance having their parcels opened. No doubt most of these deterred customers desire to ship illicit materials and Federal Express would reject these packages anyway if it knew what was in them. Some legitimate customers may also be deterred, however, because they desire privacy for reasons other than evading the law. Also, searching packages requires time, and personnel, and so costs money. A corporation must strike a balance between its public spiritedness and its profit margin.

trol" of the DEA. The arguments are similar, but the first is broader.

■ Under the first argument, once a private actor has legally opened a package, has found suspected contraband within the package, and has notified the government of the discovery, the government need not obtain a search warrant before examining and field testing the contents.[10] No warrant is required in such a situation, because the private, legal search has destroyed any legitimate expectation of privacy in the package's contents. *United States v. Jacobsen*, 466 U.S. 109, 118–22, 104 S.Ct. 1652, 1659–61, 80 L.Ed.2d 85 (1984) (government's seizure following private search was reasonable); *id.* at 122–26, 104 S.Ct. at 1661–63 (subsequent field test also reasonable). If a subsequent shipment and controlled delivery intervene (as here), the question remains whether a legitimate expectation of privacy resides in the package, but the court must also determine whether the circumstances of the intervening shipment and controlled delivery indicate "a substantial likelihood that the contents have been changed." No new privacy interest arises so long as the controlled delivery is carried out in a manner that ensures the security of the package's contents. Thus, a warrantless search following the controlled delivery is reasonable so long as no substantial likelihood exists that the contents of the package have been altered. *Illinois v. Andreas*, 463 U.S. 765, 773, 103 S.Ct. 3319, 3325, 77 L.Ed.2d 1003 (1983).

■ The government's second argument, the "continuous control" approach, is a prophylactic rule that has been used by several courts (but has not been addressed directly by the Supreme Court) to protect the same privacy interests implicated in *Andreas*. See, e.g., *United States v. Bulgier*, 618 F.2d 472, 476–78 (7th Cir.1980); *United States v. Andrews*, 618 F.2d 646, 651–54 (10th Cir.1980); *United States v. DeBerry*, 487 F.2d 448, 450–52 (2d Cir.1973); *McConnell v. State*, 595 P.2d 147, 152–55 (Alaska 1979). Under the continuous control approach, a parcel that is the subject of a controlled delivery like the one before us may be searched without a warrant after delivery if the parcel remains in continuous possession of the government, without "any substantial break in the chain of custody." *McConnell*, 595 P.2d at 153–55. In such a case, the warrantless search is not a new search at all, but only "a reassertion of physical dominion over evidence already rightfully in the government's possession." *Id.* at 154. The continuous control test differs from the *Andreas* approach primarily in methodology. The continuous control test requires that a court rigorously apply a multifactoral analysis, wherein the government must satisfy each subtest or risk suppression of the evidence in question. *See McConnell*, 595 P.2d at 154–55 (five-part *McConnell* test, applied by the district court in this case). *Andreas*, on the other hand, takes a broader focus, asking whether, under a totality of the circumstances test, the controlled delivery at issue sufficiently secured the contents of the package. *Andreas*, 463 U.S. at 772–73, 103 S.Ct. at 3324–25. The district court rejected the government's first answer out of hand because the package had left the possession and control of the DEA, but accepted the second. We affirm the district court's findings, but on different grounds.[11]

The government's initial response, that Koenig had lost any legitimate expectation

10. Because the constitution applies only to government activity, no constitutional standard of reasonableness limits a search carried out by a private actor. Thus, we need not decide whether Zito's search was reasonable. *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984). The private actor's search may be limited by criminal law, by tort law, or by market forces, *see supra*, note 9, but not by the Constitution. *Jacobsen*, 466 U.S. at 113, 104 S.Ct. at 1656. So long as the government's search does not exceed the scope of the private search, it is reasonable. *Id.* at 115, 104 S.Ct. at 1657.

11. Because we affirmed the district court's result on the expectation of privacy argument, we need not consider, for example, whether Federal Express employees became governmental agents for purposes of completing the controlled delivery. Instead, considerations such as the nature of the shipper, the security methods provided, and the actions of the shipper's employees become a part of the fact pattern to be considered in answering the ultimate question whether the package was sufficiently secured during the controlled delivery. As we read *Andreas*, its chief virtues are simplicity and

of privacy in the package, was proper. As the Supreme Court made clear in *Andreas*, the "legitimate expectation of privacy" approach may be applied to controlled deliveries, even when there has been a break in the chain of custody. Thus, the district court need not have rejected the government's expectation of privacy argument merely because Koenig's package temporarily left the custody of the DEA when the DEA forwarded the package by Federal Express. *Andreas*, 463 U.S. at 773, 103 S.Ct. at 3325. Once the package was opened and its contents discovered, Koenig lost her privacy interest in the package.

"The Fourth Amendment protects legitimate expectations of privacy rather than simply places. If the inspection by police does not intrude upon a legitimate expectation of privacy, there is no 'search' subject to the Warrant Clause. The threshold question, then, is whether an individual has a legitimate expectation of privacy in the contents of a previously lawfully searched container. It is obvious that the privacy interest in the contents of a container diminishes with respect to a container that law enforcement authorities have already lawfully opened and found to contain illicit drugs. No protected privacy interest remains in contraband in a container once government officers lawfully have opened that container and identified its contents as illegal. The simple act of resealing the container to enable the police to make a controlled delivery does not operate to revive or restore the lawfully invaded privacy rights."

*Illinois v. Andreas*, 463 U.S. at 771, 103 S.Ct. at 3324 (citation omitted). Unless the subsequent shipment and controlled delivery compromised the security of the package's contents, forwarding the package through the remainder of the delivery process to the addressee does not confer upon the addressee any new privacy interest. *Andreas*, 463 U.S. at 772–73, 103 S.Ct. at 3324–25; *see also DeBerry*, 487 F.2d at

450–51. The relevant inquiry is not whether the package was in the control, direct or constructive, of the DEA at all times. Rather, it is whether the circumstances of the controlled delivery created "a substantial likelihood that the contents have been changed." *Andreas*, 463 U.S. at 773, 103 S.Ct. at 3325. The absence of such circumstances left the package incapable of supporting a renewed privacy interest at the time Agent Hershey examined it. *See Andreas*, 463 U.S. at 772–73, 103 S.Ct. at 3324–25; and *cf. United States v. Johns*, 469 U.S. 478, 484–88, 105 S.Ct. 881, 885–87, 83 L.Ed.2d 890 (1984) (warrantless search of packages not unreasonable merely because they were stored in a warehouse for three days rather than searched immediately); *Michigan v. Thomas*, 458 U.S. 259, 261–62, 102 S.Ct. 3079, 3080–81, 73 L.Ed.2d 750 (1982) (exigent circumstances are not required for a warrantless search based on probable cause of a vehicle lawfully in police custody); *Florida v. Meyers*, 466 U.S. 380, 104 S.Ct. 1852, 80 L.Ed.2d 381 (1984) (*per curiam*). His inspection, therefore, could not have infringed upon a legitimate expectation of privacy and so could not be considered a search within the meaning of the Fourth Amendment. *Jacobsen*, 466 U.S. at 120, 104 S.Ct. at 1660.

We refuse to delineate what fact situation would present a reasonable likelihood that a package's contents have been changed. Koenig relies only on the fact that the package temporarily left the hands of the DEA, but does not explain how the excursion could have renewed her expectation of privacy. The act of sending something by common carrier does not itself create a significant risk of tampering. *See McConnell*, 595 P.2d at n. 22. Once the package was opened by Federal Express and its contents were in plain view, any privacy interest the addressee had in the package was destroyed. As long as the package was shipped in such a manner as to ensure the security of its contents, the further travels of the parcel could do nothing to restore the addressee's lost privacy

---

directness. *Andreas* achieves those virtues by shifting the focus of the inquiry away from peripheral, subsidiary issues in favor of concentrating on the real issues—the government's

right to obtain and use appropriate, probative evidence to convict criminals and the defendant's right to be protected from the use of tainted evidence.

interest. It is as if the package had been repackaged by DEA in transparent wrapping so that its contents were at all times in plain view as it moved through the system. *See Jacobsen,* 466 U.S. at 120 n. 17, 104 S.Ct. at 1660 n. 17; *Andreas,* 463 U.S. at 771–72, 103 S.Ct. at 3324 (drawing analogy to "plain view" doctrine). Here, Koenig's package was specially handled by Federal Express agents and was kept under close security throughout its shipment. The intermediate openings of the package did not compromise the package's security but, to the contrary, were undertaken specifically to ensure that its contents remained unchanged. Koenig fails to persuade us that the controlled delivery of her package may have resulted in any critical alteration of its illicit contents, apart from the initial addition of the cornstarch. Thus, the district court's refusal to suppress the evidence contained therein was proper. *Andreas,* 463 U.S. at 772–73, 103 S.Ct. at 3324–25.

### IV

█ Having affirmed the district court's refusal to suppress evidence against Koenig, we move to co-defendant Graf's contentions regarding his conviction of conspiracy to distribute cocaine. Graf believes he was entitled to a directed verdict or at least a new trial, arguing that the evidence established only that he was a customer of Koenig rather than a full-fledged member of her conspiracy. True, the purchase of drugs from a conspiracy, without more, does not rise to the level of membership in the conspiracy. *United States v. Douglas,* 818 F.2d 1317, 1321 (7th Cir.1987). "Because the crime of conspiracy requires a concert of action among two or more persons for a common purpose, the mere agreement of one person to buy what another person agrees to sell, standing alone, does not support a conspiracy conviction." *United States v. Mancillas,* 580 F.2d 1301, 1307 (7th Cir.1978). However, Graf overstates the quantum of proof necessary to show membership in a conspiracy. A conspiracy is commonly defined as "a combination or confederation of two or more persons formed for the purpose of committing, by their joint efforts, a criminal act."

*United States v. DeCorte,* 851 F.2d 948, 953 (7th Cir.1988); *United States v. Whaley,* 830 F.2d 1469, 1473 (7th Cir.1987); *United States v. Herrera,* 757 F.2d 144, 149 (7th Cir.1985); *United States v. Mayo,* 721 F.2d 1084, 1088 (7th Cir.1983). However, the government need not produce direct proof of such an agreement. Because conspiracies are carried out in secret, direct proof of agreement is rare. *DeCorte,* 851 F.2d at 953; *Mayo,* 721 F.2d at 1088. "The nature of a conspiracy is such that its existence and the involvement of the co-conspirators in it must often be proved by circumstantial evidence." *Whaley,* 830 F.2d at 1473 (citing *United States v. Redwine,* 715 F.2d 315, 320 (7th Cir.1983)); *see also United States v. Roman,* 728 F.2d 846, 858–59 (7th Cir.1984). Moreover, the evidence " 'need not exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable doubt.' " *United States v. Radtke,* 799 F.2d 298, 302 (7th Cir.1986) (quoting *United States v. Thornley,* 707 F.2d 622 (1st Cir.1983)). Thus, even if the relationship is that of buyer/seller, a conspiracy may be proved by evidence of a concert of action. *United States v. Creamer,* 555 F.2d 612, 615 (7th Cir.1977). An ongoing relationship involving the distribution of drugs is evidence of a concert of action. *Mancillas,* 580 F.2d at 1307. So is the quantity of drugs transacted, and in particular whether the amount is within a reasonable range for personal consumption. *Douglas,* 818 F.2d at 1321.

The evidence at Graf's trial, taken most favorably to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), showed that Graf was more than an occasional purchaser of drugs for personal use. Graf knew that Koenig was obtaining cocaine from a source in Florida. He allowed Koenig to use his scales to weigh one such shipment. Moreover, Graf purchased large amounts of cocaine; within a three-month period, Graf purchased 300 grams of cocaine from Koenig for approximately $20,000. A prosecution expert testified that the quantity and quality of cocaine Graf purchased would not be for personal use but for redistribution. On this evidence a jury could

reasonably have found that Graf knew of Koenig's extensive drug dealings, aided them in some ways, and furthered the goals of a conspiracy by distributing cocaine.

### Conclusion

The district court's decision to refuse to suppress the package and its contents' reception in evidence was proper. Federal Express security personnel opened the package for their own reasons and no evidence was introduced suggesting governmental control of Federal Express employees. The opening of the package and the placement of its contents in plain view of DEA destroyed any privacy interest the package might have initially supported. Once lost, subsequent examinations of the package were not Fourth Amendment searches, until some new privacy interest attached. The subsequent opening of the parcel in Peoria was therefore of no constitutional significance. Graf's motions for directed verdict and new trial were properly denied. The evidence was sufficient to allow a jury to conclude that he was more than an occasional purchaser for private use, that he was part of the conspiracy to distribute cocaine.

AFFIRMED.