UNITED STATES of America, Plaintiff,

v.

Nathaniel ELLIOT, Defendant.

No. 92 CR 25.

United States District Court,
N.D. Illinois, E.D.

Dec. 14, 1992.

Brian P. Netols, Asst. U.S. Atty., Chicago, IL, for plaintiff.

Adam Bourgeois, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Defendant Nathaniel Elliot ("Elliot"), charged in a two-count indictment arising out of his possession of 229 grams of heroin on January 13, 1992,[1] has filed a motion

---

1. As is frequently the case, both counts stem from a single event. Count One (brought under 21 U.S.C. § 841(a)(1)) charges Elliot with knowing and intentional possession of the heroin intending to distribute it, while Count Two (brought under 18 U.S.C. § 1952) charges that he traveled in interstate commerce intending to carry on that illegal activity.

charging that an unconstitutional search tainted (1) the government's obtaining of that contraband and consequently (2) Elliot's post-search inculpatory statements. After the parties had briefed the legal principles applicable to Elliot's motion to suppress, this Court determined that an evidentiary hearing was required to resolve the issues. That hearing has been conducted, and since then the parties have submitted their further memoranda to address the evidence in light of those legal principles.

This Court, having heard the evidence, credits the testimony of the two United Air Lines ("UAL") employees who testified at the hearing, neither of whom had any motivation to bend (let alone break) the truth. In summary:

1. On January 13, 1992 Elliot approached UAL O'Hare Terminal counter clerk Susan Farkas ("Farkas") with a request that she rewrite a round-trip ticket—from O'Hare to Detroit and back to O'Hare—that was dated two days earlier (not in itself an unusual occurrence). Elliot said that he wanted the ticket rewritten so that he could take the next available flight, with a return from Detroit that same afternoon. In addition, Elliot gave Farkas a large suitcase to be checked through to Detroit.

2. Farkas told Elliot that he might not be able to make the flight with the bag—the 11 a.m. flight was about to leave, and Elliot had to run to catch it. Meanwhile Farkas' suspicions were aroused by the checking of such a large piece of luggage for a short trip, when the passenger was going to be returning to Chicago within two hours or so. So instead of putting the bag on the conveyor belt after Elliot had left, Farkas called John McDonald ("McDonald"), UAL's employee in charge of all phases of security at O'Hare. McDonald came over and took the bag to the special computerized color-coded x-ray machine that UAL uses to determine the presence of weapons or plastic explosives in luggage.

3. Though UAL does have a reward procedure stemming from luggage

searches, (a) that procedure does not apply to provide any such rewards to UAL's own employees (instead the only persons eligible to receive the awards are the operators of the screening machines, who are not UAL personnel) and (b) the rewards are granted for the detection of weapons (including plastic explosives), not drugs. Moreover, Farkas was entirely unaware of any such reward arrangements to begin with, while McDonald was aware that he himself would not be eligible for any type of award even if the screening disclosed that there was anything untoward in the bag. It is also highly relevant, under the circumstances, that no governmental agency has any involvement whatever in the reward program in any case.

4. When McDonald had the bag screened, the x-ray machine (called an "E-scan") disclosed (a) an opaque object that could possibly have been a weapon and (b) the presence of another substance that from its appearance could possibly have been a plastic explosive. Accordingly McDonald opened the bag and found that the opaque object was a heavy coiled-up metal-studded belt [2] and that the other substance was a white powder (as it happens, plastic explosives and narcotics present the same type of visual appearance on the E-scan screening machine).

5. McDonald then called the Chicago Police Department to look at the bag and its contents. At that point it was learned that the white powder was in fact heroin.

### Principles of Suppression

It will be assumed for current purposes that if the search of the bag had been undertaken by any government agent, it would have been constitutionally invalid because neither probable cause nor a warrant supported the search. But even with that assumption, the principles announced in *United States v. Koenig,* 856 F.2d 843 (7th Cir.1988) nevertheless doom Elliot's motion.

*Koenig* began the relevant analysis by stating (*id.* at 846–47 (citations omitted, and with the opinion adapted to this case)):

**2.** That fact could not have been determined without opening the bag. All that the E-scan machine reflected was an apparently solid opaque object that *could* have been a weapon.

It is axiomatic that the Fourth Amendment does not apply to private entities. Like much of the Constitution, "it was intended as a restraint upon the activities of sovereign authority." The Supreme Court has held that a wrongful search or seizure conducted by a private party does not rise to a constitutional violation of the Fourth Amendment, nor prevent the government from using evidence that it has acquired lawfully. Here, [McDonald] put the contents of the [luggage] in plain view of the [Chicago Police Department]. [The government agents'] actions are therefore unassailable on Fourth Amendment grounds. The only question, then, is whether [McDonald] "must be regarded as having acted as an instrument or agent of the state" for the purpose of evaluating his initial search of the [luggage].

Disclaiming any bright-line rule for its inquiry into that last-stated question, *Koenig, id.* at 847 then reconfirmed the approach that our Court of Appeals had taken the preceding year in *United States v. Feffer*, 831 F.2d 734 (7th Cir.1987):

> In *Feffer*, this circuit agreed that "two critical factors in the 'instrument or agent' analysis are whether the government knew of and acquiesced in the intrusive conduct and whether the private party's purpose for conducting the search was to assist law enforcement agents or to further [its] own ends." Other useful indicators are whether the private actor performed the search at the request of the government and whether the government offered a reward. *Feffer*, 831 F.2d at 739–40. In all cases, however, the "court's analysis must be made on a case-by-case basis and in light of all of the circumstances." *Id.* at 739.

Finally, *Koenig*, 856 F.2d at 850 (citations omitted)—in the course of distinguishing an earlier Ninth Circuit case involving an airline search—said:

> We disagree, however, that a governmental policy such as fighting drugs or preventing hijackings is itself enough to provide the necessary level of governmental control, even if governmental and private entities voluntarily cooperate. Private carriers need not be treated as governmental agents unless it can be established that they are induced to conduct a private search by some government action.

All of that discussion might well have been written for this very case. Nothing here even begins to suggest that the UAL search was conducted for any reason other than its own legitimate concerns for air safety, or that UAL was in any respect acting as the surrogate or handmaiden for some governmental agency (either federal or local) in that respect. That being the case, the same result would be called for even if our Court of Appeals were to adopt the perspective announced and applied in *United States v. $124,570 U.S. Currency*, 873 F.2d 1240 (9th Cir.1989)—a question that this Court need not resolve.[3] Elliot cannot prevail in any event.

## Conclusion

Because the conduct of which Elliot complains was carried out by a private party without any taint of government participation, the search of Elliot's bag and the consequent recovery of the white powder that proved to be heroin did not implicate the Fourth Amendment. As for Elliot's post-search statements, neither he nor the government brought out any facts during the course of this Court's evidentiary hearing, but his able counsel has acknowledged that those statements might be suppressed only if they were found to be fruit of the

---

**3.** That Ninth Circuit decision is the case on which Elliot's post-hearing memorandum sought to rely most heavily (Mem. 6–7). There (*id.* at 1243–45) the Court of Appeals cautioned special judicial care in making certain that administrative airport screenings for legitimate purposes not be "subverted into a general search for evidence of crime" (*id.* at 1243, quoting that Circuit's earlier opinion in *United States v. Davis*, 482 F.2d 893, 909 (9th Cir.1973)). But it was *Davis* whose broadly-based premise our own Court of Appeals disavowed in *Koenig*, 856 F.2d at 850—so it is at least open to doubt whether the *$124,570* opinion would fly here. As stated in the text, however, the facts here would not call for suppression even with the heavier burden placed on the government by the Ninth Circuit's line of cases.

poisoned tree (with the search being the "tree" in this instance).

Accordingly Elliot's motion to suppress is denied in its entirety. This case may now be set for a prompt trial.