UNITED STATES of America, Plaintiff,

v.

Hannah SHELDON, Defendant.

Crim. No. 04–00106–01 SOM.

United States District Court, D. Hawai'i.

Dec. 16, 2004.

Loretta A. Sheehan, Office of the United States Attorney, Honolulu, HI, for Plaintiff.

Cynthia A. Kagiwada, Kaneohe, HI, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS

MOLLWAY, District Judge.

### I. INTRODUCTION.

Defendant Hannah Sheldon ("Sheldon") seeks suppression of evidence obtained through two allegedly illegal searches. The first search, of a mailed parcel addressed to her son Raymond, uncovered cocaine. This discovery led to a sting operation in which law enforcement officials replaced the cocaine with sugar and an electronic beeper, then delivered the parcel to Sheldon's home. The second search occurred when the electronic beeper was triggered, indicating that the package had been opened. Officers entered Sheldon's home and conducted a search, uncovering more drugs and leading to the confessions of Sheldon and her son.

Sheldon argues that, because the initial search was conducted without a warrant, the evidence obtained in that search, as well as the fruits of that search, must be suppressed. The court agrees that Sheldon's privacy interest in the Airborne Express parcel was sufficient to confer standing on her to challenge the search of that parcel, and further finds that the search violated this interest. Accordingly, the court grants Sheldon's motion to suppress the evidence.

### II. FINDINGS OF FACT.

On February 25, 2004, employees with Airborne Express, a private parcel service in Signal Hill, California, became suspicious when an individual requested overnight delivery for a parcel, but did not purchase insurance. In addition, the person who dropped off the parcel did not have identification and paid in cash. When an Airborne Express employee called the phone number of the sender, "Alex Kuhio," the person who answered did not know anyone by that name. The parcel was addressed to Raymond Sheldon, 53–216C, Punaluu, HI 96717.

Pursuant to an Airborne Express policy for suspicious packages, employee Wilfred Sarmienti opened the parcel and found a 9–inch by 6–inch blue rectangular object that was tightly wrapped in plastic wrap ("Blue Brick"), as well as approximately twelve T–Fal pots and lids. Airborne Express then notified the Signal Hill Police Department. Signal Hill Police Officer Michael Sieverman responded to Sarmienti's call. Sieverman believed that the Blue Brick had the typical appearance and feel of drugs packaged for shipping. Without obtaining a warrant, Sieverman slit the Blue Brick open and saw a white powdery substance. He tested the substance and determined it was cocaine. Sieverman then seized the entire parcel and contacted agents from the DEA, who sent the items to the DEA in Honolulu, Hawaii.

On February 26, 2004, based on the cocaine found in the Blue Brick, the Honolulu DEA obtained a warrant to place an electronic beeper in the package. The beeper would indicate the location of the parcel, as well as when the package had been opened. The warrant also authorized officers to dust the package contents with

fluorescent Sirchie powder. Based on the cocaine found in the Blue Brick by Sieverman, an anticipatory search warrant was issued on that same date for the address of the package's delivery, 53–216C Kamehameha Highway, Punaluu, HI 96717. The warrant described the house as "a single level wooden home being whitish in color with an attached single vehicle carport on the left hand side of the home as you face it; the letter 'C' is attached to the electrical box on the left corner of the home just prior to the carport." The DEA agents replaced the cocaine with sugar and repackaged the parcel.

At approximately 2:24 p.m. on February 26, 2004, an undercover officer posing as an Airborne Express delivery person went to 53–216C Kamehameha Highway and noticed a peach-colored single-level house with burgundy trim and no carport or garage next to the white house described in the search warrant. Defendant Hannah Sheldon came from the peach house to sign for the parcel. According to the Government, it was at this time that the officer realized that 53–216C actually referred to the peach house, rather than the whitish house.

Sheldon took the parcel back into the peach house. The surveillance units stationed in the area did not see the parcel leave the house at any time. At approximately 2:35 p.m., the beeper that agents had placed in the package indicated that the parcel had been opened. DEA agents immediately entered the house and secured the residence. The agents found the parcel in the bedroom normally occupied by Sheldon and her husband. Sheldon's son Raymond, the package's addressee, was also present.

DEA agents then tested Sheldon's hands for the fluorescent Sirchie powder, which glows under a black light. Sheldon tested positive for the powder, which indicated that she had handled the parcel. No other occupant of the house tested positive for the powder. Sheldon and Raymond received their Miranda rights, waived them, and gave statements to the police.[1]

In her statement, Sheldon stated that she had been expecting a package, and "had a good hunch it was cocaine in the package because my son Ray told me something was coming for me." In fact, Sheldon had signed for two other Airborne Express parcels in the past. Both had come from Isaac, her son's drug contact. Although Sheldon did not know the contents of the first parcel, the second parcel contained cocaine. Sheldon admitted that she had opened the second parcel and sold the cocaine, later paying Isaac in installments. Sheldon told police that, on the occasion in issue in the present case, Isaac "fronted" her a kilo of cocaine, and she was "supposed to pay him after she sold it." Upon receiving the Airborne Express parcel, Sheldon stated that "I took a package out of a pot that was in the box and hid it between the mattress of my bed so no one would take it."

Raymond also admitted to receiving packages of drugs in the mail. He stated that his "source" would send either "ice" or "coke." When "ice" arrived, Raymond kept the drugs, but when the package contained "coke," he gave the drugs to his mother to sell. Raymond told police that, on this occasion, he asked his source to send a shipment of stuff for "my mom." He then informed his mother that "she was going to get 'hers' any day now."

### III. *CONCLUSIONS OF LAW.*

 Sheldon claims that her Fourth Amendment rights were violated when Of-

---

1. The parties have stipulated to admission of these statements into evidence for purposes of this suppression motion, in lieu of live testimony.

ficer Sieverman, acting without a warrant, opened the tightly wrapped, opaque Blue Brick contained within the Airborne Express parcel addressed to Raymond. This court has already held that the search was illegal with respect to Raymond, and the fruits of that search have been suppressed with regard to him. Unlike Raymond, however, Sheldon was neither the sender nor the addressee of the package. Fourth Amendment rights are personal and may not be vicariously asserted. *See Rakas v. Illinois,* 439 U.S. 128, 133–34, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Accordingly, to suppress the search of the Blue Brick, as well as the fruits of that search, Sheldon must prove that the search violated her Fourth Amendment rights. *See United States v. Padilla,* 508 U.S. 77, 81, 113 S.Ct. 1936, 123 L.Ed.2d 635 (1993) (per curiam).

■ Sheldon's Fourth Amendment rights were violated if, given the totality of the circumstances, she had a legitimate expectation of privacy in the Blue Brick. *See United States v. Sarkisian,* 197 F.3d 966, 986. Sheldon must manifest a subjective expectation of privacy in the object searched, and this expectation must be objectively reasonable. *See California v. Ciraolo,* 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986) (citing *Katz v. United States,* 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)); *see also United States v. Taketa,* 923 F.2d 665, 670 (9th Cir.1991) (a defendant challenging an illegal search must show "a subjective expectation of privacy that is objectively reasonable").

■ Both the sender and the addressee have privacy interests in mailed packages. *See United States v. Hernandez,* 313 F.3d 1206, 1209 (9th Cir.2002). Generally, a third party who is neither the sender nor the addressee of a mailed package does not share this privacy interest. *See United States v. Pierce,* 959 F.2d 1297, 1303 (5th Cir.1992) ("Arguably, a defendant who

is neither the sender nor the addressee of a package has no privacy interest in it, and, accordingly, no standing to assert Fourth Amendment objections to its search."); *see also United States v. Koenig,* 856 F.2d 843, 846 (7th Cir.1988); *United States v. Givens,* 733 F.2d 339, 341–42 (4th Cir.1984).

In *Pierce* and *Koenig,* however, the Fifth and Seventh Circuits, respectively, hinted at a possible exception to this general rule. In *Pierce,* a defendant who was neither the sender nor the addressee of a package sought suppression of the contents because of an illegal search. The court denied the motion to suppress, noting that the defendant had asserted no privacy interest in the package. The defendant had "continually attempted to disassociate himself from the package," denying ownership of the package and arguing that he had never been in possession of it. 959 F.2d at 1303. Because the defendant had not "ever attempted to establish, much less prove, any privacy interest in the package," the court found that he did not have standing to challenge the search of the package. *Id.* Similarly, in *Koenig,* a defendant challenged the warrantless search of a parcel, even though he was neither the sender nor addressee of the parcel. 856 F.2d at 846. The Seventh Circuit held that he lacked standing to make the challenge, as he had "never asserted that he was part owner of the drugs in transit" and had in fact argued that he was "only a frequent customer of [the addressee]." *Id.* Because the defendant claimed "no interest, title or control over the drugs," the court ruled that he failed to establish any privacy interest in the package. *Id.*

These cases leave open the possibility that a defendant who claims an ownership interest in a package may have a privacy interest in that package, despite being nei-

ther the sender nor the addressee. *See, e.g., United States v. Allen,* 741 F.Supp. 15 (D.Me.1990) (defendant who paid a third party to receive packages on his behalf had a legitimate expectation of privacy in those packages). Sheldon argues that she fits this narrow circumstance. Although the Airborne Express parcel was addressed to her son, Sheldon claims that she owned the contents of the parcel and controlled the parcel upon its delivery. She thus argues that she had a privacy interest in the parcel sufficient to confer standing to challenge the warrantless search.

The Ninth Circuit has identified several factors to be considered in determining whether an individual has a privacy interest in an object. Sheldon's claimed ownership interest in the Airborne Express parcel is one such factor, although it is not the only factor. *See Rawlings v. Kentucky,* 448 U.S. 98, 105, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980) ("petitioner's ownership of the drugs is undoubtedly one fact to be considered in this case"); *United States v. Salvucci,* 448 U.S. 83, 91, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980) ("While property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated, property rights are neither the beginning nor the end of this Court's inquiry."). Other factors include the defendant's exercise of control and supervision over the parcel, any measures taken by the defendant to insure privacy, and whether the type of container used demonstrates a privacy interest in the contents. *United States v. Broadhurst,* 805 F.2d 849, 852 n. 2 (9th Cir.1986).

Sheldon demonstrates that she owned the Airborne Express parcel and exercised control over it upon delivery. She also took measures to reinforce her privacy interest after taking delivery of the parcel. These factors indicate that she had a valid privacy interest in the Airborne Express parcel that was violated by Officer Sieverman's warrantless search.

Sheldon states that, the day before the parcel arrived, "Ray told me something was coming for me." Raymond also states that he had asked his "source" for a shipment of drugs for his mother. Further, the day before the parcel arrived, Raymond told his mother that "she was going to get 'hers' any day now." The parcel contained cocaine, not ice, indicating that Sheldon was the intended recipient, as, according to Raymond, packages containing cocaine were intended for his mother.

Sheldon's previous drug transactions with Isaac also indicate that she was not just a "downstream purchaser" of the drugs, as the Government contends, but rather the owner of the drugs. She states that, in the past, when she received cocaine from Isaac, she paid him in installments after she sold it. The arrangement in this case appears to be consistent with that procedure, as Sheldon admitted that Isaac had "fronted" her a kilo of cocaine, and that she "was supposed to pay him after she sold it."

When the parcel arrived, Sheldon acted in a manner consistent with ownership by signing for the parcel and taking possession of it. She also acted to preserve her privacy interest in the parcel, by excluding others from the parcel and hiding it under her bed. Further, when officers entered the house and searched it, Sheldon was the only person found to have Sirchie powder on her hands, indicating that she had been the only person to open the parcel and handle its contents.

■ The Government argues that Sheldon's ownership, supervision, and control should be measured from the time Sieverman opened the Blue Brick in California, rather than from the time of delivery in Honolulu. Such a requirement, however,

would create an unreasonable burden for package recipients, who might often be unable to manifest a privacy interest before delivery. The Fifth Circuit implicitly rejected such a test in *United States v. Villarreal,* 963 F.2d 770, 774 (5th Cir. 1992), by recognizing that pre-delivery searches of items sent to fictitious addressees violated the rights of the intended recipients. Had the Fifth Circuit adopted the Government's "time of search" test, the court would likely have found that the intended recipients had not yet manifested any ownership or control over the packages. Instead, the court focused on the eventual delivery to the intended recipients, finding that the recipients had a legitimate expectation of privacy. *Id.* at 775. The Seventh Circuit has also mentioned time of delivery in referring to a recipient's possible privacy interest. *See Koenig,* 856 F.2d at 846 ("We need not decide whether a privacy interest could be recognized given proof of an ownership interest in the contents of the parcel and a showing of the ability to control the parcel once delivered.").

■ Sheldon's ownership interest in the parcel, along with her control and supervision of the parcel, is sufficient to manifest a subjective expectation of privacy. Further, this expectation was objectively reasonable, given the concealment of the Blue Brick inside a pot and in a sealed envelope. The warrantless search of the Blue Brick therefore violated Sheldon's constitutional rights and must be suppressed. Because the ensuing sting operation and subsequent home search bear a direct causal connection to the initial illegal search, the results of those operations must also be suppressed. *See Dunaway v. New York,* 442 U.S. 200, 218, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).

## IV. CONCLUSION.

Sheldon's motion is granted.

IT IS SO ORDERED.