Garsh, J.
The defendants, Alma Patricia Bojorquez (“Bojorquez”) and Manual Sanchez (“Sanchez”), are charged with trafficking in marihuana and conspiracy to traffick in marihuana. They seek to suppress evidence found during a search of a sealed package at a United Parcel Services (“UPS”) facility as well as other evidence found and statements made in connection with the arrest of Bojorquez following the search and seizure of that package.[1] For the reasons set forth below, the motions to suppress are denied.
*452 FINDINGS OF FACT
After an evidentiary hearing and evaluation of the credibility of all the witnesses, and based on all the credible evidence and reasonable inferences drawn from that evidence, the court finds the following facts:
On Saturday morning, September 27, 1997, four police officers from the Watertown and Waltham police departments working as part of the Suburban Middle-sex Couniy Police Drug Task Force ("Task Force”) — K-9 Officer Joseph Juno, Jr. (“Juno”), Detective Joseph Deignan (“Deignan”), Detective Barry Ward (“Ward”), and Detective Joseph Connors (“Connors”) — along with Barron, a certified police narcotics detection dog, were present at the UPS facility in Watertown. They were there for the purpose of drug interdiction as part of a cooperative arrangement between UPS and the Task Force which was initiated, negotiated, and coordinated by Deignan. Prior to September 27, the Task Force had conducted the same type of drug interdiction efforts at UPS at least four to six times, generally on Saturdays and generally with a narcotics detection dog being present. On those prior occasions, boxes were opened which were believed to contain contraband and, upon inspection, one to two boxes each time did, indeed, contain a controlled substance. On none of these prior occasions did any member of Task Force secure or attempt to secure a search warrant before a package was opened.
The Task Force’s presence at UPS was authorized by UPS. Spurred by the fact that UPS had from time to time contacted the Watertown Police Department to report that it had found illegal drugs in packages being shipped[2] and by anecdotal information, gleaned in August of 1997 from several UPS drivers, while Deignan was assigned to strike detail, that air shipments were a common means of transporting large amounts of marihuana within state and interstate, Deignan initiated a meeting between himself and UPS management. At this meeting, Deignan requested that UPS assist the Task Force in its drug interdiction efforts by permitting members of the Task Force to be present at the central facility in Watertown while packages from overnight air shipments were offloaded and rerouted into delivery trucks. UPS agreed.
For UPS, time was of the essence; UPS advised Deignan that the Task Force would have to complete its work within the approximately thirty minutes that generally lapsed from the time the truck arrived from the airport with 400 to 500 packages at about 8:30 AM to the time that the delivery trucks left the Watertown facility so that those trucks could complete their deliveries by UPS’s noontime deadline. There is no credible evidence as to the specific details, if any, of the arrangement worked out between UPS and the Task Force as to how the operation at UPS was to be conducted.[3] UPS also agreed to permit a member of the Task Force to borrow a UPS uniform and UPS truck for the purpose of delivering any package found to contain contraband.
On the morning in question, Deignan was the first member of the Task Force to arrive at the UPS facility. He spoke with John J. Butkuss, Jr. (“Butkuss”), the UPS air-freight supervisor whose job duties include processing the overnight mail packages for Saturday delivery. This was the same UPS employee with whom Deignan had interacted on the Task Force’s previous visits to UPS. Butkuss was also the employee whom Deignan had contacted to pre-arrange the days on which the Task Force would be present at UPS. When Deignan met with Butkuss, he reminded him that there would be four police officers at the UPS facility that day plus a trained dog. Deignan did not tell Butkuss what type of packages to look for, ask Butkuss to profile packages, seek Butkuss’ assistance in profiling packages, nor ask Butkuss to select and set aside packages that he would recognize as consistent with the shipment of illegal drugs. Additionally, Deignan did not tell Butkuss that if he came upon a package that he believed contained drugs, he should decide whether or not to open it as if the police were not present. He did not tell Butkuss that the judgment call as to whether a package could be opened was to be entirely that of Butkuss and that the Task Force was to have nothing to do with his decision to open a package. Deignan did not tell Butkuss to pretend that the police were not there and to decide to open a package only if he believed it contained drugs and not because of anything that may be said by the police. Deignan did not tell Butkuss that no package would be opened until Butkuss personally opened it or authorized it to be opened. Not only did Deignan not have such a conversation with Butkuss on September 27, 1997, but he also did not have such a conversation with Butkuss on any previous occasion.[4] Butkuss did not volunteer to profile packages for the Task Force.
Butkuss’ sole concern was that the Task Force not interfere -with his operation. When the Task Force first came to UPS, Butkuss told the officers that they must conduct their operations in such a way that it would not interfere with his responsibility to get the packages out and he, in turn, would stay out of their way. His function was to ensure that packages coming off the truck onto the moving conveyer belt were dispatched promptly into the correct delivery trucks. Butkuss performed his function by walking up and down next to the length of the moving belt.
On September 27, 1997, a truck arrived at the UPS facility from the airport with the overnight mail at about 8:30 AM. Thirty-two UPS drivers with their trucks were lined up next to the moving conveyer belt. Deignan positioned himself at the back of the truck from the airport; two UPS employees were on the truck off-loading packages onto the moving conveyer belt. As the packages were placed on the belt, they were sniffed by Barron. Juno was walking with Barron on *453 the back belt, a stationary belt that is six to eight inches away from and parallel to the moving belt. Most of the packages were placed by the UPS employees onto the moving conveyer belt where they were sniffed by Barron. Some packages, however, were held aside by Deignan because they matched some aspect of a police profile for packages likely to contain controlled substances. These packages were not placed on the moving belt; instead, Deignan handed them directly to one of the other officers who put the packages on the back belt.
Barron reacted positively to two packages on the moving belt. One of the officers removed them to the back belt. That morning, members of the Task Force placed a total of eight to ten packages on the back belt. No packages were put there by Butkuss.[5] Butkuss did not touch any of the packages removed to the back belt; he did not select them for removal to the back belt or suggest that they be put on the back belt, and he did not authorize their removal to the back belt. Butkuss did not participate in anyway in the profiling of the packages coming off the truck onto the moving, conveyer belt.
The police opened all the packages removed to the back belt even though Barron had reacted positively to only two of them. Those two contained marihuana; the others did not. As was true on the previous weeks, Butkuss did not open any of the packages, nor did he ask the police to open any of the packages, or authorize the police to open any of the packages.
Barron had reacted to the package in question almost immediately after it had been placed on the moving belt at approximately 8:45 AM. Barron is a dog specially trained to react to marihuana and other controlled substances. By September of 1997, Barron had successfully completed several weeks of formal training in narcotics detection as well as informal training. Juno, who trained with Barron, had frequently used Barron in package detection. The dog is reliable. The manner in which Barron reacted to the box signaled to Juno that the dog had detected a controlled substance.
After Barron’s reaction, the package was removed to the back belt where Ward opened it using a cutting blade knife. Connors assisted by holding the box. Before it was opened, no police officer sought Butkuss’ authority or permission to open the package, and he did not grant permission. Butkuss had no conversation with any of the officers about the opening of the box.[6] From the moment the package was placed on the back belt, it was under the exclusive domain of the Task Force.
The box met the profile for a package likely to contain marihuana because it was heavily taped at the top and bottom and around all the edges, and the flaps were glued down. This type of sealing commonly is used when marihuana is sent through the mail in order to mask the drug’s odor. The box met the profile in other ways as well. For example, the delivery and return address were handwritten; the delivery address was to a hotel; the return address was Ponoma, California, an area known to the police as a site from which marihuana is distributed. Moreover, the package had been shipped from a postal packaging center so that the sender of the package remained untraceable. The size and weight of the package were consistent with the shipment of marihuana.
The package was addressed to Doris McGleen at the Best Western Hotel in Waltham. The Task Force intended to make delivery of the package if it contained marihuana. The Task Force also intended to arrest whomever picked up the package and, if possible, to ascertain to whom that person intended to deliver the package. The police had no reason to believe that Bojorquez or Sanchez had any connection to the package.
Based on his training and some very limited experience, Deignan reasonably believed that if a UPS package were not delivered by the UPS guaranteed noon deadline, the person picking up the package would become suspicious and the Task Force probably would lose the ability to apprehend that individual and others who may have been involved with the package. Deignan was not present when Ward opened the box. Before the package was opened, none of the officers attempted to secure a search warrant or discussed the feasibility of doing so. They made no conscious decision not to seek a warrant because of any perceived exigency. The conviction that a warrant was unnecessary because there was no state action was the reason no warrant was sought on September 27, 1997.[7]
On no prior occasion in connection with its drug interdiction efforts at UPS had the Task Force attempted to secure a search and seizure warrant. The Task Force knew before it went to the facility that if it were to develop probable cause, it would be between 8:30 AM and 9:00 AM.
When the package addressed to McGleen was opened, the officers found cellophane wrapped “bricks” inside which, based upon their training and experience, reasonably appeared to constitute compressed marihuana. The police repackaged, resealed, and retaped the package using a box supplied by Butkuss and tape that the police purchased.
Viewing the totality of the evidence, the search and seizure of the package at issue constitutes serious, distinctly egregious police misconduct. The search and seizure of the package was simply one in a series of warrantless searches and seizures spanning several weeks, many of which involved no probable cause; the police were not acting at the specific explicit behest of the airfreight supervisor at UPS; they gave no consideration to obtaining a warrant. I infer that the Task Force intentionally and unlawfully searched and seized the package for the purpose of facilitating arrests. At a minimum, the Task Force acted recklessly.
*454 Deignan, wearing a UPS driver’s uniform borrowed from UPS and driving a UPS truck on loan from UPS, delivered the package to the Best Western Hotel in Waltham, leaving it with a clerk at the front desk at 11:00 AM. Other members of the Task Force were inside the hotel lobby performing surveillance when Deignan arrived. Twenty to thirty minutes later, Bojorquez walked through the front door of the hotel and approached the front desk. She asked the clerk if there was a package for Doris McGleen, in Room 302, whom she stated was a friend of hers. The clerk indicated that there was such a package, but that the name and room number did not match, to which Bojorquez responded that she was there to pick up the package. The clerk advised Bojorquez that the package was heavy, asked if she had a car, and inquired whether she wished him to carry the package out for her. Bojorquez assented, exited the lobby, retrieved a car, and parked it in front of the hotel. Bojorquez opened the trunk, and the desk clerk, who had carried the package out of the hotel, placed it in the trunk. Bojorquez closed the trunk of the car; as she attempted to enter the car, an officer approached, displayed his badge, and placed Bojorquez under arrest. She was not handcuffed at that point, but her keys were taken from her, and one of the officers opened the trunk of the car.
Once the police apprehended Bojorquez, Deignan was notified, and he and Juno approached. Inside the trunk were two packages; the second package looked identical to the one that had been delivered by Deignan except it was addressed to a female other than McGleen at a hotel in Dedham. It was separated from the one that had been opened at UPS; Barron alerted positively to the second package. Deignan peeled some of the bottom wrapping back; when he did so, he saw what, based upon his training and experience, he reasonably believed to be compressed marijuana.
After viewing the contents of the second box, Deignan identified himself to Bojorquez as a police officer with the Watertown Police Department and advised her of her Miranda rights. Bojorquez told Deignan that she understood her rights. Deignan asked if she were willing to waive those rights and speak with him; she said that she would. Bojorquez appeared nervous but composed. She did not appear to be under the influence of alcohol or any narcotic, nor did she appear to be suffering from any mental illness or impairment. She spoke English and was capable of understanding her Miranda warnings. No promises were made or rewards offered before Bojorquez spoke to Deignan, and no threats were made to induce her to waive her right to remain silent. I find, beyond a reasonable doubt, that when she agreed to speak with Deignan, Bojorquez knowingly, willingly and voluntarily waived her Miranda rights, and that her statements thereafter were made voluntarily, rationally, and freely. Bojorquez told Deignan that she knew that there was marihuana in the boxes, but that she did not know for whom the boxes in her trunk were destined.
After talking to Deignan, Bojorquez was placed in handcuffs and taken to the Waltham Police Department. The two boxes were also taken to the Waltham Police Department. When Bojorquez was arrested, she was in possession of a digital pager; Deignan noted several two and three digit pages, not identifiable telephone numbers, coming into the display screen of the pager. The use of two and three digit numbers is consistent with the sending of coded messages.
At the police station, Bojorquez again was read her Miranda rights. She acknowledged understanding each of her rights and signed a form to that effect. Although upset, and crying from time to time, Bojorquez understood her rights and voluntarily agreed once again to speak with the police and to cooperate. She responded rationally and intelligibly. She provided some information in response to questions, but she declined to disclose the name of the person who had picked her up at the airport when she arrived in Boston, the name of the person to whom she was to deliver the marihuana, or the details of her financial arrangements for delivering packages of marijuana sent into Massachusetts from California. The conversation was in English. An officer told her that the situation she found herself in was not a “good one,” and, that if she cooperated, it would be noted with the District Attorney, but he made no promises and did not threaten Bojorquez. I find, beyond a reasonable doubt, that Bojorquez knowingly, willingly, and voluntarily waived her Miranda rights at the police station and that her statements thereafter were made voluntarily, rationally, and freely.
Bojorquez agreed to cooperate with the police by telling the individual who had paged her that her car had been towed to Waltham Auto Body. In the presence of three officers, one of whom was Spanish-speaking, Bojorquez had a conversation in Spanish with an unknown individual. Following that conversation, the vehicle she had been driving was taken to Waltham Auto Body, and the two boxes that had been taken from that vehicle were placed back into the trunk.
At 5:30 PM, Sanchez and another male arrived at Waltham Auto Body where they approached an officer, who was posing there as a mechanic. They engaged him in conversation about the status of the vehicle. After being told that the disabled car could not be left on the street overnight, the two sought and obtained permission to retrieve belongings from inside the vehicle and the trunk by representing themselves to be very good friends of the driver. Once the officer opened the truck, each of the men grabbed a box, walked to their vehicle, and put the two boxes into the trunk of that car. Both men then were arrested.
Bojorquez did not have a legitimate expectation of privacy in the package while it was at UPS. Sanchez did not have a legitimate expectation of privacy in the package while it was at UPS.
*455 RULINGS OF LAW
Where police have conducted a warrantless search and seizure, the Commonwealth has the burden of proving that it falls within a permissible exception to the warrant requirement and is therefore reasonable. Commonwealth v. Berry, 420 Mass. 95, 105-06 (1995). However, that burden attaches only after the defendant has demonstrated that a search and seizure in the constitutional sense has occurred. Id, at 105; see also Commonwealth v. McCambridge, 44 Mass.App.Ct. 285, 289 (1998). A search is not protected by the Fourth Amendment or article 14 of the Massachusetts Declaration of Rights if it is conducted by a private freight company which is not acting as an agent of the police. United States v. Jacobsen, 466 U.S. 109, 113 (1984); Commonwealth v. Varney, 391 Mass. 34, 38 (1984).
Because the court credits the testimony of the UPS supervisor that the police opened the box addressed to Doris McGleen without any input from him, the Commonwealth’s position that the search was conducted by a private party, and thus falls outside the scope of the Fourth Amendment and article 14, is rejected. If police open containers sent by mail or private carrier, the requirements of the Fourth Amendment must be satisfied. Jacobson, 466 U.S. at 114. Even if Butkuss’ testimony were not to be credited, the Task Force operation at UPS hardly could be charaterized as “hands-off.”[8]
I. Probable Cause to Search and Exigent Circumstances
Once a reliable, well-trained narcotics detection dog affirmatively reacted to the box in a way that his handler understood to indicate the presence of contraband, probable cause was established. E.g., Florida v. Royer, 460 U.S. 491, 506 (1983). Probable cause alone does not justify a warrantless search in the absence of exigent circumstances. The burden is on the Commonwealth to demonstrate exigency. Commonwealth v. Huffman, 385 Mass. 122, 124 (1982). The Commonwealth must show that it was impracticable for police to have obtained a warrant. Id. at 124.
While it is true, as defendants argue, that there was no danger of evidence being removed or destroyed while the police sought a warrant,[9] the concept of exigency is broad enough to encompass those situations where obtaining a warrant is impracticable because it would thwart an arrest. Where police have probable cause to believe a shipped package contains drugs, but delaying the delivery in order to obtain a warrant to seize would alert the suspects to police involvement and frustrate their apprehension, an exigency may exist justifying seizure without a warrant. United States v. Ford, 525 F.2d 1308, 1313 (10th Cir. 1975) (exigency where package seized after private inspection had to be shipped from Oklahoma City to California in timely fashion or subject would have become suspicious and avoided arrest). See also United States v. De La Fuente, 548 F.2d 528, 539, n. 14 (1977). However, the failure of the police to obtain a warrant to seize can only be excused where “the circumstances at the time of the seizure were sufficiently exigent to make their course of action imperative.” Ford, 525 F.2d at 1313. Where probable cause has been established, even assuming some exigency exists justifying seizure, a warrantless search is not automaticallypermissible. If, at that point, the property is in the control of the police, neutralizing the threat of destruction of evidence, and no demanding circumstances justify an immediate search, “the Fourth Amendment mandates the intervention of a detached Magistrate and the issuance of a warrant before there occurs a further intrusion on an individual’s privacy interests.” People v. Adler, 409 N.E.2d 888, 890-91 (N.Y.), cert. denied, 449 U.S. 1014 (1980).
The time when probable cause arose has an obvious bearing upon whether exigent circumstances existed when the search was carried out. In Commonwealth v. Wigfall, 32 Mass.App.Ct. 582, 586-87, rev. denied, 413 Mass. 1104 (1992), for example, because there were three hours between the time that probable cause to arrest arose and the time of the warrantless entry and search, the police had no “justifiable excuse why it was impracticable for them to obtain a warrant.” Compare Commonwealth v. Minh Ngo, 14 Mass.App.Ct. 339, 340-42, rev. denied, 387 Mass. 1103 (1982) (two hours not enough time to obtain warrant) with Commonwealth v. Forde, 367 Mass. 798, 802 (1975) (failure of the Commonwealth to explain why no effort was made to obtain a warrant in three hours is fatal to claim of exigency).
Barron alerted to the box three hours and fifteen minutes prior to the noon delivery deadline. The Commonwealth did not persuasively demonstrate that this was insufficient time to obtain a warrant and make delivery of the package in Waltham. An on-call judge residing in the region where the UPS facility is located is available at all hours on Saturdays to review warrant applications and can be reached by beeper or telephone. The ability to borrow a UPS truck and uniform had already been pre-authorized by UPS. The failure of the officers to discuss whether there was time to obtain a warrant and the Task Force’s failure on all past occasions to have attempted to obtain a warrant to search or seize a box at UPS undercuts the notion that there were exigent circumstances. Moreover, at the hearing, the Commonwealth’s witnesses did not offer the impracticability of securing a warrant as the actual explanation for their failure to have sought a warrant on September 27, 1997.
In sum, the Commonwealth did not meet its burden of establishing an exigency which would justify the warrantless search and seizure of the package at UPS. A defendant with standing to challenge the search and seizure would be entitled to suppression of the evidence obtained from a search of both boxes as well as the statements made by Bojorquez, all of which are the fruit of the search and seizure at UPS.[10]
*456 II. Standing
A. Legitimate Expectation of Privacy
A defendant generally can challenge an unreasonable search and seizure only if the defendant has a subjective expectation of privacy in the place searched or the item seized and society recognizes that expectation as reasonable. California v. Ciraolo, 476 U.S. 207, 211 (1986); Commonwealth v. Price, 408 Mass. 668, 672 (1990). The burden is on the defendants to demonstrate that they had a legitimate expectation of privacy. Commonwealth v. D’Onofrio, 396 Mass. 711, 714-15 (1986); Commonwealth v. Brass, 42 Mass.App.Ct. 88, 89, cert. denied, 424 Mass. 1108 (1997).
Mail is subject to Fourth Amendment protection because “(1)etters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy ...” Jacobsen, 466 U.S. at 114. See also Commonwealth v. Garcia, 34 Mass.App.Ct. 386, 393 (1993) (receipt of letters and packages is inherently private). The addressee and the sender of a package each has the requisite privacy interest to contest a search or seizure. See, e.g., Varney, 391 Mass. at 38 (addressee has privacy interest in package’s contents); United States v. Villarreal, 963 F.2d 770, 774 (5th Cir. 1992) (senders and addressees have standing to object to search en route); State v. Pohle, 390 A.2d 692, 696-97 (N.J. 1978), rev’d on other grounds, 400 A. 2d 109 (1979) (addressee and co-defendant whose address is on package both have standing). If the consignee is a fictitious person, an individual who shows that the package was addressed to him, although under a fictitious name, might also have a reasonable expectation of privacy. Villarreal, 963 F.2d at 774-75 (co-conspirators both have standing where one had receipt indicating ownership that bore the name Roland Martin and the other had been identified as Roland Martin; neither denied their possessory interest and they consistently acted as if they were the ones who were to receive transported materials). See also United States v. Pierce, 959 F.2d 1297, 1303 n.11 (5th Cir.) cert. denied, 113 S.Ct. 621 (1992) (distinguishing between packages addressed to the alter ego of a defendant and those addressed to an individual other than the defendant).
The addressee is presumed to be the true owner unless there is evidence to the contrary showing that the defendant had a legitimate privacy interest in the package at the time of the search. United States v. Smith, 39 F.3d 1143, 1144 (11th Cir. 1994) (letter not addressed to defendant and his equivocal testimony that it was really intended for him insufficient to establish standing); United States v. Koenig, 856 F.2d 843, 846 (7th Cir. 1988) (defendant lacks standing if he is neither sender nor addressee and does not assert any ownership interest in the drugs in transit); United States v. Givens, 733 F.2d 339, 341-42 (4th Cir. 1984) (no reasonable expectation of privacy in package addressed to another actual person even if defendant is intended recipient); State v. Christel, 211 N.W.2d 801, 808 (Wisc. 1973) (in the absence of testimony from defendants at suppression hearing, list inside package containing their first names is insufficient to overcome presumption that addressee is owner), overruled on other grounds, State v. Poellinger, 451 N.W.2d 752, 756-57 (1990). Cf. State v. Kosta, 748 P.2d 72, 75 n.2. (Or. 1987) (testimony during suppression hearing that A, to whom package was delivered, was told by B, to whom he had intended to deliver package, that defendant C, who was coming to pick up the package, was going to “end up with it” is insufficient to establish C’s protectible interest under state constitution).
Bojorquez and Sanchez did not satisfy their burden of demonstrating a protectible privacy interest in the package opened and seized at UPS. There is no evidence that would suggest either defendant mailed the package, and they were not the addressee. There is no evidence that Doris McGleen is a fictitious person and the alter ego of Alma Bojorquez. The mere fact that Bojorquez presented herself at a hotel, was permitted by the hotel clerk to take the package, and knew that the package contained marihuana is insufficient to meet her burden of demonstrating a possessory, proprietary, or other protectible privacy interest in the package while it was in transit. When Sanchez retrieved the package, he, like Bojorquez, represented that he was acting on behalf of a friend. There is no evidence that Sanchez is the person with whom Bojorquez communicated when she spoke to someone by telephone at the police station. There is no evidence that he had prepaid for the marihuana. The mere fact that Sanchez took possession of the package with another man is insufficient to meet his burden of establishing a protectible privacy interest in the package when it was at UPS.
The defendants chose not to testify at the hearing, and the affidavits filed in support of the suppression motions assert no privacy interest whatsoever in the package searched and seized at UPS. Without more, Bojorquez’s “alleged status as an intended recipient ... is simply not sufficient to confer upon [the defendants] a legitimate expectation of privacy in the contents of a package sent through an independent carrier and addressed to someone other than [the defendants].” New Hampshire v. Alosa, 623 A.2d 218, 222 (1993).
B. Automatic Standing
In order to avoid forcing a defendant to choose between admitting to facts that demonstrate a privacy interest in order to demonstrate standing at the suppression hearing or not testifying and, therefore, not making incriminating statements, Massachusetts has adopted automatic standing as a matter of state constitutional law. Commonwealth v. Amendola, 406 Mass. 592, 601 (1990). “When a defendant is charged with a crime in which possession of the seized evidence *457 at the time of the contested search is an essential element of guilt, the defendant shall be deemed to have standing to contest the legality of the search and seizure of that evidence.” Id. at 601 (emphasis added). In Commonwealth v. Frazier, 410 Mass. 235 (1991), the Court reiterated that the concept of automatic standing is not broad enough to confer standing to challenge an allegedly illegal search and seizure on anyone charged with possession as a result of the search. “The dispositive issue in determining whether a defendant has automatic standing is whether ‘possession of the seized evidence at the time of the contested search is an essential element of guilt.’ ” Id. at 243, quoting Amendola, 406 Mass. at 601. When the Court in Frazier extended the automatic standing rule beyond the limit of a house and automobile search to the search of a co-defendant’s handbag, it reasoned that the fact that the defendant did not have actual possession of the seized item at the time of the search and was not present during the search did not preclude him from having automatic standing because he had been charged with constructively possessing the drugs found in the handbag at the time of the search. Id. at 243-45.
Where, however, the search takes place out of the presence of the defendant on territoiy where the defendant had no right to be, and where a third parly is not a confederate in the commission of the crime, the automatic standing rule does not eliminate the requirement to show a legitimate expectation of privacy. Commonwealth v. Carter 424 Mass. 409, 411-12 (1997). Neither Sanchez nor Bojorquez had a right to be in the UPS facility, and they were not present during the search. Neither UPS nor any of its employees is alleged to be a joint venturer. Therefore, the defendants must demonstrate that a constitutionally protected search occurred. Id. To do so, they must produce evidence that the police intruded on a reasonable expectation of privacy. Id. The defendants had no expectation of privacy in the UPS facility and so must demonstrate a legitimate expectation of privacy in the package itself. As discussed above, they failed to meet their burden of establishing a reasonable expectation of privacy in the package while it was in transit.
Furthermore, possession of the box searched at UPS is not an essential element of the crimes with which the defendants are charged. Possession is not an essential element of the conspiracy charge. Frazier, 410 Mass. at 245-46. The offense of trafficking in marihuana, the other charge made against the defendants, can be committed in any of three ways: (1) knowingly or intentionally manufácturing, distributing, dispensing, or cultivating marihuana; (2) possessing with intent to manufacture, distribute, dispense, or cultivate marihuana; and, (3) bringing marihuana into the commonwealth. G.L.c. 94C, §32E(a). “(P]ossession is an essential element in two of the three categories of activities prohibited by the statute Fraizer, 410 Mass. at 245 (analyzing the substantially identical provision of the statute prohibiting trafficking in a class B controlled substance). The first two categories are the ones for which possession is an element. Fraizer, 410 Mass. at 245; Commonwealth v. Perry, 391 Mass. 808, 813-14 (1984), citing Commonwealth v. Gagnon, 387 Mass. 768, 769 (1982), cert. denied, 464 U.S. 815 (1983) (crime of possession is a lesser included offense of the crime of manufacturing, dispensing or distributing a controlled substance); Commonwealth v. Manrique, 31 Mass.App.Ct. 597, 604 (1991), cert. denied, 411 Mass. 1106 (1992) (elements of the third prong of trafficking are the bringing into the Commonwealth of a controlled substance from some place outside and the defendant’s participation in some manner in the act of importing).
The first category of trafficking is not at issue here. Possession is not an essential element of the third category. With respect to the second category, the facts charged by the Commonwealth and the representations made by the Commonwealth at the hearing and in its post-hearing memorandum, representations on which the defendants are entitled to rely, make it clear that the defendants are not charged with constructive possession of the box at the time of its search at UPS. The possession alleged in connection with the second prong of trafficking arose, if at all, when the hotel clerk put the box into the trunk of the vehicle operated by Bojorquez. Thus, the Commonwealth is not advancing contradictory positions in charging trafficking and opposing the defendants’ standing to challenge the search and seizure of the package at UPS.
C. Target Standing
“Target standing” is a theory designed to permit a defendant to contest the search of a third person where police violate the constitutional rights of the “little fish” with the intent to catch a “big fish." Commonwealth v. Manning, 406 Mass. 425, 429 (1990) (target standing not appropriate where challenged conduct merely produced information used to justify issuance of search warrant and no intentional wrongdoing). The defendants urge that the circumstances of this case warrant the adoption of target standing.
The United States Supreme Court rejected target standing. United States v. Payner, 447 U.S. 727 (1980). “Our Fourth Amendment decisions have established beyond any doubt that the interest in deterring illegal searches does not justify the exclusion of tainted evidence at the instance of a party who was not the victim of the challenged practices.” Id. at 735, citing Rakas v. Illinois, 439 U.S. 128, 137 (1978). See also Alosa, 623 A.2d at 221-22; State v. Benjamin, 417 N.W.2d 838, 840 (N.D. 1988).
The Supreme Judicial Court has not recognized target standing. Commonwealth v. Scardamaglia, 410 Mass. 375, 379 (1991) (no tangible evidence seized in allegedly unlawful stop and no significantly improper conduct because question of probable cause was a *458 close one). The Supreme Judicial Court also has not rejected target standing. “[SJerious, distinctly egregious police misconduct. . . might justify granting the defendant the right (under the ‘target standing’ theory) to challenge the allegedly unlawful search.” Commonwealth v. Waters, 420 Mass. 276, 278 (1995) (emphasis added).
Here, the Task Force had the right to be at UPS, and it had probable cause to search and seize the box addressed to McGleen. What makes the unlawful search and seizure of that box serious and distinctly egregious is not the lack of exigency, in and of itself, but the fact that a belief that it would have been impracticable to obtain a warrant was not the reason that a warrant was not sought and that the opening of this box was not an isolated matter. It was but one in a series of searches spanning several weeks-in which the warrant requirement was rountinely disregarded and numerous packages were opened without probable cause.
The defendants contend in their post-hearing memorandum that, given these facts, this court is “left with the task of devising a remedy to punish the conduct [of the Task Force] in the investigation and courtroom testimony.” They maintain that granting them target standing would be an appropriate punishment. For the reasons articulated by the Supreme Court in Payne, this court declines to adopt target standing as a matter of state constitutional law. I do not assume that improper conduct, “if brought to the attention of responsible officials, would not be dealt with appropriately.[11] To require in addition the suppression of highly probative evidence in a trial against a third party would penalize society unnecessarily.” Payne, 447 U.S. at 733-734 n.5.
ORDER
For the reasons set forth above, it is hereby ORDERED that the defendants’ motions to suppress evidence be and hereby are DENIED.

 Following the evidentiary hearing, both defendants withdrew their contention that the search of a second sealed box in the trunk of Bojorquez’s car following her arrest is independently invalid. In addition, Bojorquez withdrew her argument that she had not been given Miranda warnings prior to making statements to the police or that, even if her rights had been explained to her, any statements by her had not been made voluntarily. The defendants do argue that the results of the second search as well as the statements must be suppressed as fruits of the first search and seizure.

 The UPS supervisor who testified stated that he only opened packages that were damaged or leaking; he did not know whether UPS’s agreement with its customers would have permitted him to open packages that were not damaged, but he assumed that he did not have carte blanche to open undamaged packages.

 Deignan testified that UPS required him to agree that only a UPS airfreight supervisor or someone from its Loss Prevention Department could make the decision whether to open a package and that he so agreed. I have grave doubts as to the truthfulness of other parts of Deignan’s testimony and, thus, without corroboration from UPS, I am unwilling to credit his testimony as to the role UPS offered to play when the Task Force was on its site. No one from UPS management advised the airfreight supervisor of the critical responsibility he allegedly had when the Task Force was present at UPS. If it were to be assumed that the arrangement between Deignan and the UPS did require one of its employees to decide whether a particular box could be opened, the Task Force did not comply with the express terms of that arrangement and exceeded the scope of its authorization from UPS.

 I find Deignan’s testimony to the contrary to be untrue. I find Butkuss’ testimony that he did not have such a conversation with Deignan on September 27, 1997, or at any other time, to ring true. Butkuss, a witness called by the Commonwealth, appeared to be utterly frank and forthright with no motive to prevaricate. If Butkuss were to be profiling the boxes and making decisions as to what boxes should be opened as if the Task Force were not present, there would have been no reason to have the police dog at the UPS facility sniffing packages, no reason for Juno to be interpreting the dog’s actions for Butkuss as he said he did, no reason for Deignan to be in the truck inspecting the packages before they were off-loaded, and no reason for both Task Force officers and UPS to be profiling, as Deignan said they were. If Butkuss were to perform all the duties Deignan claims to have outlined for him, undoubtedly one of his superiors at UPS would have so advised him, but Butkuss was never authorized by anyone at UPS to profile and open undamaged packages. Indeed, it would have been difficult for Butkuss to perform his job responsibilities — making sure that all the packages were loaded on the right delivery trucks quickly so that the packages could be delivered by noon- — if he were simultaneously responsible for profiling packages and making individualized decisions as to which packages, if any, should be opened. For example, due to the length of the belt, at times Butkuss was up to eighty feet away from Deignan and the other members of the Task Force.

 The testimony to the contrary is not credible.

 I do not believe the testimony of Ward and Connors that Butkuss said words to the effect, “While I check these other packages to save time, can you open the package for me?” or “Go ahead, I give you permission to open the box.” I find the testimony of Butkuss, which directly contradicts that of the officers, to be more credible.

 In unrelated matters, it has taken Deignan four hours to obtain a search warrant on a Saturday; here, large portions of the affidavit could have been drafted beforehand. In any event, a belief that no warrant was needed, and not any practical difficulty with obtaining a warrant, motivated the Task Force not to seek one.

 See generally United States v. Kelly, 529 F.2d 1365, 1371 (8th Cir. 1976) (consent by UPS to a search by the FBI does not satisfy the requirements of the Fourth Amendment); Commonwealth, v. Dembo, 301 A.2d 689, 693-95 (Pa. 1973).

 Of course, the box could have been secured pending an application for a warrant to search and seize. United States v. Van Leeuwen, 397 U.S. 249, 252-53 (1970) (upholding detention of mail while search warrant could be obtained).

 The Commonwealth argues that even if the defendants have standing to challenge the illegality of the search and seizure, suppression would not be mandated. That contention is based on the erroneous assumption that the police had evidence independent of the illegal search and seizure which supplied the probable cause to arrest Bojorquez and to search and seize the two boxes in connection with her arrest. "Evidence which may have been unlawfully seized does not . . . automatically become sacred and inaccessible ... Instead the apt question in such a case is whether granting the establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to *459 be purged of the primary taint.” Commonwealth v. Frodyma, 393 Mass. 438, 441 (1984) (citations omitted). Evidence is not fruit of the poisonous tree if it is obtained through an independent source, if the connection between the improper conduct and the evidence is so attenuated as to dissipate the taint, or the Commonwealth can demonstrate that the evidence inevitably would have been discovered by lawful means. Commonwealth v. Fredette, 396 Mass. 455, 459 (1985). Here, all the evidence upon which the police relied upon to arrest Bojorquez and seize further evidence flowed directly from the initial unlawful search and seizure. When Barron reacted to the box, the police had probable cause to believe that there was contraband in that box, but they had no probable cause to believe or even to suspect that Bojorquez and Sanchez were linked to the package. The only way the defendants came to the attention of the police was through the Task Force’s illegal seizure of the box; it was delivered by the police, not by UPS, to the hotel. The arrest of Bojorquez and all that flowed from that arrest is the direct fruit of the illegal search and seizure. Accordingly, the Commonwealth’s reliance on Commonwealth v. Weiss. 370 Mass. 416 (1976), is misplaced. In that case, before illegally searching a locker, the officer had probable cause based on a private search; there was no unlawful seizure and delivery of the evidence following the police search. Id. at 420.

A copy of this decision will be forwarded to the Chief of the Watertown Police Department, the Chief of the Waltham Police Department, the District Attorney for Middlesex County, and the Attorney General.